697 P.2d 818

George A. BINT, Claimant-Appellant,

v.

CREATIVE FOREST PRODUCTS, Employer, and Maryland Casualty Company, Surety, Defendants-Respondents.

Edwin W. DALTON,
Claimant-Appellant,

v.

CREATIVE FOREST PRODUCTS, Employer, and Maryland Casualty Company, Surety, Defendants-Respondents,

and

State of Idaho, Industrial Special Indemnity Fund,
Defendant-Respondent.

No. 15192, 15392.

Supreme Court of Idaho.

Jan. 29, 1985.

Rehearing Denied April 11, 1985.

Lynn M. Luker, Goicoechea Law Office, Chartered, Boise, for claimant-appellant.

John W. Barrett, and Michael Grover McPeek, Moffatt, Thomas, Barrett & Blanton, Chartered, Boise, for Creative Forest Products.

Samuel Kaufman, Jr., Anderson Kaufman, Ringert & Clark, Paul S. Penland, Lojek & Penland, Boise, for Industrial Special Indem. Fund.

DONALDSON, Chief Justice.

Appellants, George Bint and Edwin Dalton, seek worker's compensation benefits from respondent, Creative Forest Products (CFP), for damages they suffered as a result of exposure to red cedar dust while they were employed at CFP. CFP manufactures patio furniture from cedar.

George Bint began working at CFP on January 6, 1982. Bint testified that on or about the 7th or 8th of February, 1982, he began having a sore throat, and within four to five days had a severe cough and chest pains. He began coughing up phlegm and sawdust and had a runny nose. Several times he lost his voice. CFP owner, Brian Soptyk, told Bint he should see a doctor, and Bint testified that Soptyk set up an appointment with Doctor Venning for him on March 9. Doctor Venning saw Bint on March 9. He diagnosed Bint as suffering from an occupational illness caused by his exposure to the cedar dust at CFP. He advised Bint not to return to work. Bint did not return to work, and consequently,

his last day at CFP was March 9, 1982. Bint was also examined by Doctor Torrington who characterized his occupational disease as "non-acute," in that it had an insidious onset rather than an acute onset.

The time sheets from CFP show that during the 63-day period from January 6, 1982, through March 9, 1982, Bint worked on 59 calendar days. Bint testified, however, that, he was on call 24 hours per day, and sometimes went in for short periods without punching in. Additionally, the time sheets reflect that Bint on several occasions worked from 10 to 19 hours per shift.

Bint filed a claim for worker's compensation benefits. Respondents moved to dismiss pursuant to the 60-day exposure requirement of I.C. § 72–439. A hearing was held on this issue. The Commission found that Bint worked a total of 59 calendar days for the employer; that Bint did have an occupational disease; and that the occupational disease was non-acute. The Commission dismissed Bint's claim pursuant to I.C. § 72–439, for failure to meet the 60-day exposure requirement.

Edwin Dalton began working at CFP on December 7, 1981. He continued working until January 12, 1982, when he suffered an injury to his finger. He was off work for approximately two months as a result of that injury. He returned to work on March 15, 1982, and worked through April 23, 1982. The time sheets from CFP indicate that Dalton worked a total of 48 shifts on 51 calendar days. On 11 occasions, Dalton reported for work but did not work due to machine breakdowns.

Prior to his employment at CFP, Dalton had chronic lung disease. As a result of his exposure to red cedar dust at CFP, Dalton developed an allergy which led to asthma. Due to his respiratory problems Dalton ceased work at CFP on April 23, 1982. He was advised by his doctor to stay away from red cedar dust.

Dalton filed a claim for worker's compensation benefits. The Industrial Special Indemnity Fund was made a party to his action because Dalton alleged he was total-

ly and permanently disabled as a result of the combined effect of his allergy to red cedar dust and his pre-existing impairment. Respondents move to dismiss pursuant to the 60-day exposure requirement of I.C. § 72–439. The Commission found that Dalton worked a total of 48 shifts at CFP; that he did have an occupational disease; that the disease was non-acute; and that as a result of his pre-existing lung disease and the occupational disease he has a permanent-partial impairment equal to 10% of the whole person. The Commission dismissed Dalton's claim for failure to meet the 60-day requirement of I.C. § 72–439. Dalton's and Bint's claims were consolidated for purposes of this appeal.

Appellants present three issues on appeal: (1) Did the Industrial Commission err in its finding that claimants' occupational diseases were non-acute for purposes of applying I.C. § 72–439? (2) Did the Industrial Commission err in concluding that claimants had not met the 60-day exposure requirement? (3) Does the 60-day exposure requirement for non-acute diseases violate the fourteenth amendment to the United States Constitution, and article 1, sections 2 and 13 of the Idaho Constitution? We will address each issue in turn.

Appellants first contend that the Commission erred in its finding that their diseases were non-acute. I.C. § 72–439 provides that "[a]n employer shall not be liable for any compensation for a non-acute occupational disease unless the employee was exposed to the hazard of such disease for a period of sixty (60) days for the same employer." The Idaho worker's compensation statutes do not provide a definition of the terms "acute" or "non-acute." The applicable dictionary definition of the term "acute" is "having a sudden onset, sharp rise, and short course." Webster's New Collegiate Dictionary 13 (1981 ed.). Similarly, the medical world defines an "acute" disease in terms of a short and sharp course: "Of short and sharp course, not chronic; said of a disease." Stedman's Medical Dictionary 20 (4th Lawyers ed. 1976).

The medical testimony in both cases indicates that appellants suffered from non-acute occupational diseases. Doctor Torrington was the medical expert who testified in both cases. He stated that, based on the medical literature, the majority of patients who develop red cedar induced asthma do so after a period of time, usually over a period of several months. For that reason, he testified that the disease was chronic rather than insidious. As to both appellants, he testified that because their symptoms developed gradually, over a period of several weeks or months, he would characterize their disease processes as non-acute.

█ Based on the above testimony, the Commission found, in both cases, that the diseases were non-acute for purposes of applying I.C. § 72–439. The Commission's findings are supported by the evidence in both cases. Where contested findings of the Commission are supported by substantial, competent evidence, those findings will not be disturbed on appeal. I.C. § 72–732(1); *In re Chavez*, 104 Idaho 279, 658 P.2d 950 (1983); *Bush v. Bonners Ferry School Dist. No. 101*, 102 Idaho 620, 636 P.2d 175 (1981). Therefore, we hold that the Commission did not err in determining that, under I.C. § 72–439, appellants' diseases were non-acute.

Appellants next contend that the Commission erred in concluding that they had not met the 60-day exposure requirement. Like the word "non-acute," the word "day" is not defined in the worker's compensation statutes. Appellants ask this Court to hold that "days of exposure" may refer to different time frames depending on the facts presented. Appellant Bint asserts that in his case we should define days of exposure as "equivalent work days." It is his position that a day of exposure refers to an 8-hour work day and that on those days where he worked in excess of eight hours, he should be credited with more than a single day of exposure. Appellant Dalton, on the other hand, urges that in his case a day of exposure should be interpreted as a calendar day. Dalton worked 48 shifts on

51 days and seeks credit for 51 rather than 48 days of exposure. We decline to adopt such an inconsistent position.

We note that the Industrial Commission did apply a different legal standard to determine the number of days of exposure in the two hearings, albeit, not in the way the appellants wished. In Bint's case, the Commission determined that a day of exposure meant a calendar day of work, regardless of whether an employee worked more or less than eight hours. In Dalton's case, the Commission ruled that the number of days of exposure was to be determined by the number of shifts worked.

█ We believe that the legislature intended a day of exposure to refer to a calendar day of work. If the 60-day requirement were to be measured by an 8-hour work shift, problems would arise in determining how to count exposure on the days where an employee worked more than or less than eight hours. For example, where an employee worked less than eight hours on a given calendar day, would he be credited with one-half day of exposure, or a fractional portion of the day calculated by the ratio of his hours worked over the total hours? We do not believe that the legislature intended to create such a factual morass. The calendar day rule eliminates the procedural technicalities called for by the appellants' position. It also gives workers the benefit of the doubt in those cases where they have worked less than an eight-hour shift on a given day or where their shift started on one day and ended on another. Consequently, we hold that a day of exposure, under I.C. § 72–439, means a calendar day of work.

█ Additionally, appellants contend that a day of exposure should be interpreted broadly enough to include days on which appellants reported to work but did not actually work, and even days on which appellants did not report to work at all. (The last contention is based on the fact that appellants carried some cedar dust in their lungs throughout the entire period they were employed at CFP. Thus, appellants contend they continued to be exposed

on those days when they did not work.) We decline to adopt such a broad interpretation of the exposure requirement.

In our view, a worker is exposed to the hazards of an occupational disease only on those days he works within the hazardous environment. Thus, we hold that the 60-day exposure requirement under I.C. § 72–439 means that an employee must have worked on 60 calendar days for the same employer before the employer is liable for worker's compensation. This view is consistent with our earlier decisions. *Jones v. Morrison-Knudsen Co., Inc.*, 98 Idaho 458, 567 P.2d 3 (1977); *See McLean v. Hecla Mining Co.*, 62 Idaho 75, 108 P.2d 299 (1941).

In *McLean, supra,* we held that although more than 60 days had elapsed between the date of hire and the date of discharge, the individual had worked only 45 days and, thus, was not entitled to compensation. Similarly, in *Jones v. Morrison-Knudsen, supra,* we held that I.C. § 72–439 requires 60 days of exposure to the hazardous environment and directed the Commission to count the number of exposures.

■ Appellants' final contention is that I.C. § 72–439 is unconstitutional on both equal protection and due process grounds. Appellants first assert that the statute violates the equal protection clauses of the United States and Idaho Constitutions in that it establishes an unreasonable classification between workers with acute and workers with non-acute occupational diseases. Since I.C. § 72–439 creates no suspect, "near" suspect, or invidiously discriminatory classification and since it does not involve a fundamental or "quasi" fundamental right, the proper standard for equal protection review is the "rational basis test." *Heese v. A & T Trucking*, 102 Idaho 598, 600, 635 P.2d 962, 964 (1981). *See also LePelley v. Grefenson*, 101 Idaho 422, 614 P.2d 962 (1980); *Jones v. State Board of Medicine*, 97 Idaho 859, 555 P.2d 399 (1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). Under the "rational basis test," a classification will withstand an equal protection challenge if there is any conceivable state of facts which will support it. *State v. Bowman*, 104 Idaho 39, 41, 655 P.2d 933, 935 (1982); *School Dist. No. 25, Bannock County v. State Tax Commission*, 101 Idaho 283, 288, 612 P.2d 126, 131 (1980).

■ Appellants assert that the distinction between acute and non-acute diseases is arbitrary and without a reasonable relationship to the purpose of the worker's compensation laws. The purpose of worker's compensation is to provide compensation for "injuries received and *occupational diseases contracted in* industrial and public work ...." I.C. § 72–201 (emphasis added). Worker's compensation does not purport to be a social insurance program covering all a worker's health problems. The legislature has a legitimate interest in seeing that coverage for occupational diseases be kept within reasonable limits and in controlling the financial impact on Idaho industry and consumers. The legislature might have determined that these interests made it reasonable to establish a condition precedent of 60 days exposure before imposing liability for non-acute occupational diseases. The legislature might also have determined that it would be unfair to impose liability on employers for time-related diseases without imposing a corresponding time requirement on the employment relationship.

As we stated above, one of the principal distinctions between an acute and non-acute illness is the length of onset time. An acute illness is characterized by a sudden onset, while a non-acute illness develops more gradually, generally over a period of weeks or months. Given the time-related nature of non-acute illnesses, it seems reasonable for the legislature to impose a time requirement before the right to worker's compensation benefits accrues.

Historically, occupational disease coverage has lagged behind accidental injury coverage. There were various reasons for the lag. One reason was the view that while accidental injuries were known to the common law, the concept of occupational disease was unknown. To the extent that

worker's compensation was seen as substituting non-fault liability for injuries potentially subject to fault liability, there was thought to be no place for occupational diseases. Another reason was hesitation over whether a problem as generalized and extensive as occupational disease could be effectively dealt with under workers' compensation. The final, and perhaps the most compelling, reason was the fear that the heavy incidence of occupational disease would place an unbearable burden on the compensation system. 1B A. Larson, Workmen's Compensation Law § 41.20 (1982).

Idaho adopted its first occupational disease statute in 1939, the Occupational Disease Compensation Law. 1939 Idaho Sess. Laws, ch. 161, at 286. This Court has previously recognized that the statute was a departure from the original Compensation Act, which did not provide compensation for occupational diseases, and has shown deference to the limitations promulgated by the legislature for administering the Act. In *Habera v. Polaris Mining Co.,* 62 Idaho 54, 108 P.2d 297 (1940), we stated:

> "This statute is a departure from the original compensation law and is intended to include certain occupational diseases in the list of compensable accidents not theretofore covered. In attempting to do so, the legislature evidently anticipated difficulty in the application and administration of such an act unless very definite bounds were fixed within which it might operate. It accordingly prescribed certain limitations and prohibitions ...." *Id.* at 56, 108 P.2d at 298.

 The Act extended coverage to a specific list of occupational diseases. It also provided various limitations on coverage including the 60-day exposure requirement. The 60-day rule has remained a part of Idaho law ever since. It was re-enacted in its present form in 1971. 1971 Idaho Sess.Laws, ch. 124, § 3, at 424. While we recognize that the 60-day exposure requirement may, in some cases, mandate harsh results, it is not our function to adjudge the wisdom of I.C. § 72–439. We are concerned only with its constitutionality: whether it is unreasonable, arbitrary, capricious or discriminatory. It will not be held to be so where it reflects a reasonably conceivable, legitimate public purpose. *State v. Bowman,* 104 Idaho at 42, 655 P.2d at 936; *State v. Cantrell,* 94 Idaho 653, 655, 496 P.2d 276, 278 (1972). As we stated above, it seems reasonable for the legislature to impose a time requirement before providing compensation for diseases which take a considerable period of time to develop. Thus, we hold that I.C. § 72–439 does not violate the equal protection clause of either the United States or Idaho Constitutions.

 Appellants further assert that the statute violates the due process clauses of the two constitutions by establishing an irrebutable presumption that causation is lacking whenever a claimant with a non-acute occupational disease has worked less than 60-days. The applicable standard of analysis under a due process challenge is the same as under an equal protection challenge: whether the challenged law bears a rational relationship to a legitimate legislative purpose. *Heese v. A & T Trucking,* 102 Idaho 598, 635 P.2d 962; *Jones v. State Board of Medicine,* 97 Idaho 859, 555 P.2d 399. For the reasons stated above, we hold that I.C. § 72–439 survives a due process challenge as well.

The decisions of the Industrial Commission are affirmed.

No attorney fees on appeal.

Costs to respondent.

SHEPARD and BAKES, JJ., concur.

BAKES, Justice, concurring specially.

This is a troublesome case, and the dissenters are justifiably concerned with the result reached on these two claims. However, I do not believe that the problem results from an improper interpretation of the statute by the majority of the Court, or by the claim that the constitutional protection against denial of due process or equal protection has been violated. Rather, the real concern lies in the fact that an occupa-

tional disease which disabled two workmen in less than sixty working days each was determined to be "non-acute" and therefore non-compensable under I.C. § 72–439. If the result in this case is wrong, the wrongness relates to the factual finding of the Industrial Commission that the occupational disease from which these two claimants were suffering was non-acute. However, there is substantial competent evidence to sustain that finding, and accordingly the commission's decision must be affirmed. Idaho Const., Art. 5, § 9; I.C. § 72–732; e.g., Hays v. Amalgamated Sugar Co., 104 Idaho 279, 658 P.2d 950 (1983); Graham v. Larry Donohoe Logging Co., 103 Idaho 824, 654 P.2d 1377 (1982); Ford v. Bonner County School Dist., 101 Idaho 320, 612 P.2d 557 (1980); Maez v. Thunderbird Market, 101 Idaho 128, 609 P.2d 660 (1980) (Supreme Court is bound by Industrial Commission's findings of fact and review is limited to questions of law).

Nevertheless, it seems to me that in future cases other medical evidence might be available to establish that such short term exposure which results in disability, as has occurred here, might well be acute, rather than non-acute, and the Industrial Commission, as the finder of fact, might so find. That, to me, is the better way to solve a perceived inequity in these types of cases, rather than to disregard the clear meaning of the statute or to over-extend the Constitution in order to try to do justice in these cases.

HUNTLEY, Justice, dissenting.

The majority opinion demonstrates the type of improper analysis which can flow from a failure to understand the purpose and intent of statutory language.

Specifically involved is the second paragraph of I.C. § 72–439:

72–439. LIMITATIONS.—An employer shall not be liable for any compensation for an occupational disease unless such disease is actually incurred in his employment and, unless disablement or death results within four (4) years in case of silicosis, or one (1) year in case of any other occupational disease, after the last injurious exposure to such disease in such employment, or, in case of death, unless death follows continuous disability from such disease, commencing within the period above limited for which compensation has been paid or awarded or claim made as provided in this chapter, and results within four (4) years after the last injurious exposure.

An employer shall not be liable for any compensation for a non-acute occupational disease unless the employee was exposed to the hazard of such disease for a period of sixty (60) days for the same employer.

The genesis of the above language and similar statutes in other states was to address the situation where, for example, a coal miner developed black lung disease or a hard-rock miner developed silicosis while working for a series of two or more employers. Since in such occupational diseases medical science was not able to determine which employment caused the disease, the policy was that as to those slowly developing diseases (non-acute), either (1) the last employer for whom the workman had worked at least 60 days would be responsible; or (2) responsibility would be apportioned among all employers for whom the man had worked at least 60 days. Larson Workmen's Compensation Law, Volume 4, Section 95, contains the following bold face which explains the origin and purpose of statutes of this nature:

**§ 95.00 When a disability develops gradually, or when it comes as the result of a succession of accidents, the insurance carrier covering the risk at the time of the most recent injury or exposure bearing a causal relation to the disability is usually liable for the entire compensation. In some jurisdictions apportionment has been worked out by judicial decision, or provided for by express statute, when events within the coverage periods of successive insurers contribute causally to the final disability.**

Typical statutes are that of Oregon [1] and West Virginia. In *McClanahan vs. Workmen's Compensation Commission*, 158 W.Va. 161, 207 S.E.2d 184 (1974), the court commented:

> This Court notices that silicosis is an occupational disease which develops from protracted exposure to dust. However, the Legislature has determined that charges for silicosis disability shall be apportioned among employers for whom the claimant worked for at least sixty days within three years of the last exposure, W.Va. Code, 23-4-1 (1971), and that the date of injury shall be considered the date of last exposure. (207 S.E.2d at 186).

In the cases of both Bint and Dalton, the evidence is undisputed that their claimed disabilities resulted from inhaling cedar dust and the *only* employment where they were exposed is Creative Forest Products.

Thus, in terms of its purpose, the paragraph and its 60-day exposure requirement is inapplicable.

However, even if the Commission were required to give meaning to the statute, it should be interpreted in a manner which would not result in its being unconstitutional by setting up arbitrary and unreasonable classifications.

From the record it is clear that neither the Commission nor the doctors testifying clearly understood the meaning of "acute" or "non-acute" as used in statute.

The surety argues that under this Court's ruling in *Jones v. Morrison-Knudson Co.*, 98 Idaho 458, 567 P.2d 3 (1977), we implicitly recognized that "non-acute" refers to the method of onset (cause?) of a disease, and the surety now urges that position. Yet here the doctors testifying herein defined non-acute, not in terms of *causation* but in terms of length of time it takes the *symptomatology* of the disease to develop. [2]

The absurdity of the application of the statute to cases of this nature can be illustrated by one example: Suppose a worker was employed at the Idaho National Engineering Lab for only 15 days and, during that employment, inhaled a particle of radioactive dust on one occasion which caused lung disease three years later. Radiation exposure being an occupational disease,

---

1. 3. Permanent Partial Disability. Where compensation is payable for an occupational disease, the employer in whose employment the employee was last injuriously exposed to the hazards of such disease and the insurance carrier, if any, on the risk when such employee was last so exposed under such employer, shall alone be liable therefore, without right to contribution from any prior employer or insurance carrier, provided, however, that in the case of silicosis or asbestosis, the only employer and insurance carrier liable shall be the last employer in whose employment the employee was last exposed to harmful quantities of silicon dioxide ($S_1O_2$) dust on each of at least sixty (60) days or more, and the insurance carrier, if any, on the risk when the employee, was last so exposed under such employer. (85 O.S.1971, § 11(3)).

2. Dr. Torrington testified as follows regarding the onset of the claimant's disease:

 Q. Doctor, in your specialty, do you diagnose between acute and non-acute disease processes?
 A. Yes.
 Q. And in Mr. Dalton's case based on the history he related to you about his employment with Creative Forest Products and the onset of his symptoms, do you regard his condition as being acute or non-acute?
 \* \* \* \* \* \*
 A. It—the question is another difficult one. I believe that the symptoms as they initially progressed began as a very sub-acute or indolent or chronic-type of progression but, by the time after he had been working for several months—with the planer and sanding equipment, I think he had acute asthma.
 And I think that he was acutely ill by that time he was sick, and he needed treatment. Is that—
 Q. Well, let me ask you this one: when you use the term acute in this sense of acute asthma, are you referring to the degree of the symptomatology that one experiences?
 A. Yes.
 Q. Alright. In terms of the disease process and how the process develops, do you regard that disease process in Mr. Dalton's case as having [been] acute or non-acute?
 A. I would have to say inasmuch as this allergy developed over a period of months that the disease process occurred in a non-acute manner in terms of the symptomization that ultimately related to the asthma.

was this disease acute or non-acute? Under the Commission's ruling (and the decision of this Court), it would be non-compensable.

In Mr. Bint's case it is agreed he had worked 59 days. On the 59th day he had an appointment (set up by the employer) with Dr. Venning for the subject problem. Dr. Venning instructed Bint to not go back to work in the cedar dust environment.

Thus, the rule sought by the surety and adopted by the Commission means that if an employee contracts a disease at his employment with serious effects within, say 45 days, to get compensation the employee must stay for instance on the job and suffer 15 more days of exposure before qualifying for coverage. Clearly, neither the acute/non-acute dichotomy nor the 60-day requirement itself have any relationship to whether or not a person has contracted an occupational disease from a specific employment. To deny a claimant workman's compensation benefits simply because his onset of symptoms was non-acute, and because he did not work for more than 60 days, has no relationship to the stated policy under I.C. § 72–201 of providing sure and certain relief for workmen contracting occupational diseases, and therefore clearly represents an arbitrary and unreasonable classification in violation of the equal protection clauses under the Federal and Idaho Constitutions.

I would reverse with instructions providing a constitutional gloss on the statute, that is that it applies to circumstances where there are successive employments causing the occupational disease but that it is inapplicable where the evidence establishes only one causative employment.

BISTLINE, J., concurs.

BISTLINE, Justice, dissenting separately.

A fact of life is that the fines of red cedar dust do not exit an employee's respiratory system the instant the employee leaves the place of employment. Other than for those fines expelled by coughing or sneezing, these disease producing particles are thereafter with the employee—doing him bodily damage whether he is working or is not working. Here, as Justice Bakes in his special concurrence concedes, two working men were rendered disabled in less than 60 working days. This will suggest to any reasonable mind that the ravages of cedar dust against the unfortunately susceptible move swiftly and relentlessly. Although the employee does not work a 24-hour daily shift, the dust in his system does.

All of which leads me to say that the case relied upon by the Commission, McLean v. Hecla Mining Co., 62 Idaho 75, 108 P.2d 299 (1940), was either poorly decided or erroneously decided, or both. The short opinion in that case shows that it was released on December 10, 1940, based only on the authority of Habera v. Polaris Mining Co., 62 Idaho 54, 108 P.2d 297, also released that very same December 10, 1940, which is remarkable. Especially when, as the practicing bar has long known, this Court seemingly goes into a veritable frenzy of releasing opinions near the end of the year when statistics are important because the legislature is about to convene.

Equally remarkable, in both cases the claimant-respondent was not represented in proceedings before this Court, either by counsel or in person. The grounding of the McLean decision on Habera was not sound. Habera, a miner as was McLean, was only employed by Polaris a total of 20 days. We are not talking about working days, but the total period of employment! Obviously Habera had not been at Polaris exposed to the hazards of the disease for 60 days. Moreover, as the opinion discloses, he had gone to work on a conditional basis, the condition being that he was required to take and pass a physical examination. He was given the examination at the end of two weeks, with x-rays revealing "a moderate degree of silicosis, scaling of both apices with evidence of tuberculosis." 62 Idaho at 55, 108 P.2d at 298. This conditional employment was terminated five days later. Where Habera had only been in the employ of Polaris for 20 days, the Court

could readily say as it did that he had not been exposed to the hazards of the disease by employment with Polaris for 60 days.

*McLean,* however, is a different matter. After reciting the provisions of the law, " 'An employer shall not be liable for any compensation for a non-acute occupational disease unless such claimant *was exposed to the hazard of such disease* for a period of sixty days for the same employer,' " *McLean, supra,* at 77, 108 P.2d at 300, the Court, inadvertently one would hope, by changing the language of the law it had just recited, was able to say, and hold:

> While more than sixty days elapsed between the date on which respondent was hired by appellant and the date on which he was discharged from his employment in appellant's mine, *he was exposed to the hazards of the employment* forty-five days, at most. The law, above quoted, prohibits the recovery of compensation in this case. (*Habera v. Polaris Mining Co. and State Insurance Fund,* 62 Ida. 54, 108 Pac. (2d) 297).

*Id.,* at 77, 108 P.2d at 300.

McLean, as with Habera, had also been *conditionally* hired, having been told by Hecla before he commenced work that "he would be required to take a physical examination later and whether or not he would continue in the employment ... would depend on the results of the examination." *Id.* He was given a physical examination by physicians about the eighth or ninth of December, and was discharged because it showed him to be suffering from silicosis.

It takes but little deduction to conclude that the Court could see no reason for McLean to fare any better than Habera simply because Hecla allowed McLean to continue work through the Christmas holidays before discharging him, and in that manner went beyond the 60 days. This result was readily accomplished by declaring that he had only been exposed to the hazards of *employment* for 45 days, whereas the law spoke in terms of "exposure to the hazard of such *disease.*" Both *Habera* and *McLean* were largely bot-

tomed also on the circumstance of conditional employment.

I know not what course others may take, but if there was ever a case for overruling it is *McLean,* where the employer was able to prevail against an unrepresented claimant by the Court's misuse of another decision released the same day, and by the Court's confusing hazard of disease with hazard of employment.

Axiomatically, *Jones v. Morrison-Knudsen Co., Inc.,* 98 Idaho 458, 567 P.2d 3 (1977), though not controlling, is likewise highly suspect, where our opinion, at page 462 of 98 Idaho, 567 P.2d 7, first speaks of the statute's 60 days of exposure to *hazard of disease,* and further on in the same paragraph speaks of the statute's requirement of "sixty days of exposure to the *hazardous conditions of employment.*

A reading of the Commission's order denying reconsideration makes rather self-evident the Commission's feeling that its ruling was based primarily on *McLean,* and that its decision adverse to Bint was based not on its own view, but in obedience to the command of a poor decision handed down 44 years ago:

> In this case, even though the claimant might have carried the cedar dust in his lungs subsequent to his last exposure or in time periods between exposure, those times cannot be considered in calculating the necessary 60 days of exposure to the hazards of the disease. See *McLean v. Hecla Mining Co., supra; Jones v. Morrison-Knudsen Co., Inc., supra.*

> The claimant's Motion for Reconsideration is hereby denied.

> Order Denying Claimant's Motion for Reconsideration, R., p. 29.

Quare: Will this Court rise to the occasion and overrule the *McLean* case which stands as a barrier precluding the Commission from administering the Worker's Compensation Law fairly as well as liberally?

## ADDENDUM

After the foregoing was written, the Clerk's Office was able to retrieve and hand me the *Habera* and *McLean* files. If

it be that any members of the Court require *factual* justification for overruling *McLean*, these interesting files provide it.

*Habera.* In proceedings before the Industrial Accident Board (as the Industrial Commission was then called), Polaris responded to Habera's pro se claim with this answer:

Come now the defendants and as a joint and several Answer to the Application for Hearing herein and Claim for Compensation, admit, deny and allege as follows:

I.

The defendants deny each and every allegation therein contained except as hereinafter admitted in this Answer. The defendants admit that the claimant worked for the various period of time and for the various employers named in said Application and said Claim; the defendants further allege that the claimant did not given said employer written, or other notice of the manifestation of the alleged silicosis within 60 days after the alleged first manifestation, if any, thereof, and in that respect the defendants allege that claimant never gave said employer written or other notice of the manifestation of the alleged silicosis until April 29, 1940.

WHEREFORE, the defendants herein having fully answered claimant's Application for Hearing and Claim for Compensation pray that the claims be denied and the Application be dismissed.

It is at once observed that Polaris did not plead the 60-day exposure requirement of I.C.A. § 43–2109 (now I.C. § 72–439). Nor did Polaris plead the similar requirement of I.C.A. § 43–2107, which fixed liability in silicosis cases solely upon the last employer where "the employee was last injuriously exposed to the hazards of the disease during a period of sixty days or more after the effective date of this chapter." [1]

The only affirmative defense pleaded was the requirement of 60-day notice of I.C.A. § 43–2126, which bars a claim for occupational disease compensation "unless written notice of the manifestation of an occupational disease shall be given by the workman to the employer within sixty days after the first manifestation thereof ..." which is the exact language found in the Polaris answer. The Industrial Accident Board made findings and conclusions in favor of Habera, and awarded him total compensation of $240, computed at $12 per week for twenty weeks.

Only on the appeal from the Board's award did Polaris *for the first time* raise the 60-day exposure requirement by a specification of error that the "findings of fact do not show ... that respondent had been in injuriously exposed to the hazards of an occupational disease, silicosis or otherwise, during a period of sixty days while in the employment of said employer."

As Point and Authority No. VII, Polaris stated:

Since respondent had been employed by his employer herein for a period of only 20 days (from October 15, 1939, to November 5, 1939), prior to respondents' discharge, under no circumstances could appellants be liable for *any* compensation for *non*-acute silicosis, because the employment had not been for a period of *60* days prior to such discharge.

I.C.A. secs. 43–2109; 43–2107; 43–2121; 43–2122;

(Emphasis original.)

It also cited *In re Jeffries*, 105 Ind.App. 349, 14 N.E.2d 751, which was also cited in the *Habera* opinion.

Further elaboration is unnecessary. The Court simply broke the rules in deciding the case on an issue which had not been submitted to the Industrial Accident Board. In doing so it treated the unrepresented workman unjustly. What does appear from reading the Polaris brief is that counsel correctly read the statute as requiring a 60-day period of employment, not 60 work-

---

1. I.C.A. §§ 43–2109 and –2107 were so designated in Idaho Sess.Laws, ch. 161, which created the Occupational Disease Compensation law. The enactment became effective July 1, 1939.

ing days of exposure in the mines. Why did the Court break the rules?

*McLean.* *McLean* was submitted to the Industrial Accident Board at Wallace one day after *Habera.* The *McLean* decision and award were made on the same date as *Habera.* There was more at stake in *McLean,* however, than the $450 total award. Counsel for Hecla, now deceased but well-known to us few remaining older practitioners, Chas. A. Horning, in a three and one-half page answer filed with the Board, affirmatively alleged I.C.A. § 43–2107, and further alleged the unconstitutionality of I.C.A. § 43–2122 by reason of ambiguity, uncertainty, and indefiniteness—which would be the main premise of his appeal to this Court—to challenge the 1939 Act which provided benefits for people contracting occupational diseases. The Court in *McLean, supra,* 62 Idaho at 78, 108 P.2d at 300, accurately states Hecla's constitutional specification of error, and on the same page ducks the issue by reason only of having first allowed itself to be confused concerning 60 days of exposure to the hazards of the *disease* and 45 days of exposure to the hazards of employment, based, of course, on *Habera.*

To which should be added that Mr. Horning, in hot pursuit of an answer to his important constitutional issue [2] did *not* in his appeal brief specify as error the Board's failure to apply I.C.A. § 43–2109 in the manner which the Court would gratuitously do it for Hecla. The specifications of error are appended.

In ARGUMENT, Mr. Horning opened his brief thusly:

My principal contention upon this appeal is going to be that Section 43–2122, I.C.A., under which the respondent's claim for compensation was filed and upon which the award in respondent's favor was based, is unconstitutional and void. I shall discuss this question first and shall then discuss the other points which I have raised, upon the assump-

tion, for the sake of argument only, that Section 43–2122 is not void.

Nothing in argument even touched upon the applicability of I.C.A. § 43–2109.

Moreover, returning to proceedings before the Board, the very short reporter's transcript reveals that the 60-day requirement issue pleaded in Hecla's answer was not pursued in the slightest. In clarifying what issues were before the Board, Accident Board Member Suppiger stated:

We understand this application is under Section 43–3133 I.C.A. or under what is known as the Occupational Disease Compensation Law. We understand further that there are only three main issues involved, which we understand to be the question as to whether the man has a non-disabling silicosis, was he discharged from his employment because he had such non-disabling silicosis and did he by reason of that discharge suffer a wage loss. We would like to have you confine the matter as closely as you can to that.

Later on, the third issue—whether McLean suffered a wage loss—was stipulated to in the affirmative, leaving Mr. Suppiger to state: "All right. Now then, as we understand it, it leaves but two issues. Did he have a non-disabling silicosis and was he discharged on account thereof and the amount of his wage loss."

Thus, the first time that the statement that Idaho's Occupational Disease Act requires 60 *working* days of exposure to hazards of disease surfaces is found in the body of the *McLean* opinion; it was never argued before the Accident Board in either Habera's or McLean's hearings, nor before this Court on the two appeals. And then, the *McLean* Court can only cite to *Habera* for authority, which citation is misfounded, since it is readily apparent that *Habera* held nothing of the sort. *McLean* has no validity.

### APPENDIX

### SPECIFICATIONS OF ERROR

1. The Industrial Accident Board erred in assuming jurisdiction to conduct a hear-

---

**2.** The Court 62 Idaho at page 78, 108 P.2d 299 saw merit in his contentions, but passed the

problem on to the legislature, which was to convene within a month.

ing upon respondent's claim for compensation, and in assuming jurisdiction and power to make and enter an award in favor of respondent and against appellant, for the reasons:

(1)—That in his claim for compensation and his application for hearing the respondent did not allege, and at the hearing upon said claim he did not offer any evidence whatsoever to prove that while in the employ of the appellant he had ever at any time been exposed to the inhalation of silica dust or in anywise exposed to the hazards of silicosis, and did not, therefore, state a cause of action.

(2)—That in his claim for compensation and his application for hearing the respondent did not allege, and at the hearing upon said claim he did not offer any evidence whatsoever to prove that he had silicosis, or that he was in anywise disabled.

(3)—That Section 43–2122, I.C.A., under which respondent's claim was filed, is void and of no effect for the reasons: that it violates Section 17 of Article 3 of the constitution of Idaho, in that said section is not plainly worded; that it is so indefinite, ambiguous, uncertain and unintelligible that it is impossible to understand said section or to comply with it or enforce it; that said section contains provisions which are in such irreconcilable conflict with the intent of the legislature that it is invalid and inoperative; that said section contains within itself such conflicting and irreconcilable provisions that, with or without regard to other sections of the Occupational Disease Compensation Law, said section is not understandable, and is void.

2. The Industrial Accident Board erred in making and entering its finding of fact numbered "VI" to the effect that by reason of his discharge by appellant, the respondent suffered a weekly wage loss of $31.25, for the reason that such finding is not supported by any evidence whatsoever, the undisputed testimony, and the testimony of respondent himself, being (as found by the Board in its findings of fact numbered "III" and "IV") that respondent was employed by appellant upon the express condition that respondent would be required to take a "pre-employment examination" by a physician and that his employment would cease if such examination should not be satisfactory, and that he was discharged strictly in accordance with his contract of employment.

3. The Board erred in making and entering its finding of fact numbered "VII" for the reason that Section 43–2122, I.C.A. is void and of no effect for the reasons herein above stated.

4. The Board erred in making and entering its ruling of law to the effect that respondent was entitled to an award against appellant for weekly compensation commencing with the 9th day of January, 1940, to the date of the award, for the reason that neither the evidence in the case nor the Board's findings of fact numbered "III" and "IV" support such ruling, the undisputed testimony and the Board's said findings of fact numbered "III" and "IV" being as set out in the foregoing specification of error numbered "2"; and for the further reason that there is no evidence whatsoever in the record to the effect that respondent was ever exposed to the inhalation of silica dust or to the hazards of silicosis while he was in appellant's employ, and for the further reason that Section 43–2122, I.C.A. is void and of no effect for the reasons hereinabove stated.

5. The Board erred in making and entering its ruling of law to the effect that the respondent was entitled to an award against appellant for weekly compensation from and after the date of the award in the amount of the difference between respon-

dent's average weekly wages earned by him prior to January 9, 1940, and the "amount of his weekly earnings, if any, thereafter, not to exceed $12.00 a week until he shall have received as compensation a sum equal to, but not to exceed $450.00 in all," for the reasons:

(1) That neither the evidence in the case nor the Board's findings of fact numbered "III" and "IV" support or permit any such award, the undisputed testimony and the Board's said findings of fact being as set out in the foregoing specification of error numbered "2".

(2) That no evidence whatsoever was offered to show that respondent was ever at any time exposed to the inhalation of silica dust or in anywise exposed to the hazards of silicosis while he was in appellant's employ.

(3) That Section 43–2122, I.C.A. is void and of no effect for the reasons hereinabove stated.

(4) That such award is void for the reason that it is not based upon any evidence whatsoever and is not based upon nor supported by any finding of fact by said Board, there being no evidence and no finding of fact to the effect that respondent's earnings subsequent to the date of the award would be equal to or in excess of his earnings prior to January 9, 1940; and such award is void for the further reason that it is so undefinite and uncertain as to the amount which the Board intended to award to the respondent and as to the amount which appellant should pay to respondent, or as to whether under the terms of such award anything at all would ever become payable from appellant to respondent, or as to how or by whom the amount, if any, to be paid by appellant to respondent should be determined and fixed, that such award could neither be complied with nor enforced.

## ON DENIAL OF PETITION FOR REHEARING

BISTLINE, Justice.

On the petition for rehearing the votes to grant of Justice Huntley and myself were insufficient under the rules of the Court. Had even one member of the majority voted for a rehearing, then, in this very important case the Court would have expended one hour of its valuable time in hearing oral argument—and perhaps not even that. The lesson to be learned is that three not only beats two, but that three, when so motivated, can avoid a rehearing. Which may be well in some cases, because it is necessary to keep the production line moving. However, rehearings have been granted in other cases of considerably less legal moment, which may present a genuine concern to the trial bar.

Doubting that anything added at this stage can work any miracle, I write only to suggest the error in not granting a rehearing. The Court is not asked to *ipso facto* reverse its position—only to give the important issues deserving further consideration.

Justice Huntley and I wrote independently of each other. His dissenting opinion spelled out persuasively the purpose and intent of I.C. § 72–439 which states the requirement that for a non-acute occupational disease the employer shall not be liable for any compensation unless the employee was exposed to the hazard of the disease for sixty days in the same employment. His well-reasoned opinion had no impact upon a majority bent upon standing fast to a holding "that the 60-day exposure requirement ... means that the employee *must have worked on 60 calendar days* for the same employer before the employer is liable...." The text of I.C. § 72–439, which does not appear in the majority opinion, does not so provide. It requires a *60-day period of employment.* No mention is made of calendar working days. The holding of the majority is pure *ipse dixit.* It is said to be fortified by *Jones v. Morrison-Knudsen Co., Inc.*, 98 Idaho 458, 567 P.2d 3 (1977) and by *McLean v. Hecla Mining Co.*, 62 Idaho 75, 108 P.2d 299 (1940).

The majority, although cognizant of the Industrial Commission's acknowledgment that claimant carried the dust in his lungs

in-between calendar working days, and was thus exposed, adamantly declined to follow its own admonition to *"see McLean v. Hecla Mining Co."* Accepting that advice, *McLean* was visited, not just the Idaho Reports, Vol. 62 at p. 75, but the original appeal record and briefs. A report of my in-depth inquiry into *McLean* and its companion case, *Habera v. Polaris Mining Co.*, 62 Idaho 54, 108 P.2d 297 (1940), was presented to the majority in a documented dissent which illustrated beyond any reasonable doubt that *McLean* had no validity whatever, and *Habera* merely set the stage for avoiding attorney Horning's well-mounted constitutional attack on the newly enacted Occupational Disease Compensation Law. Turning Mr. Horning's argument and authority aside, the Court said:

> We do not find it necessary to pass upon the constitutionality of the statute, in order to decide the case and, therefore, will not do so.... However, we recommend that the legislature, which will convene shortly, give careful attention to the provisions of the Occupational Disease Compensation law, and, particularly, that portion of it having to do with silicosis, to the end that its provisions be clarified.

*McLean, supra,* 62 Idaho at 78, 108 P.2d at 302. While it is not difficult to understand why the Court chose to throw this hot potato to the legislature with the latter about to meet, I blush for the manner in which it was dismissed—at the expense of the claimant McLean and his $480 total award. Unfortunately, the escape from passing on the constitutional question in such a manner has perverted the compensation law for now almost a half century. Here the Commission and its referee were bound by it. This Court, however, is not so restricted.

Touching upon the theme of Justice Huntley's opinion, and fortifying it in the utmost, is the original 1939 enactment, to which my attention was attracted upon being advised to *"see McLean."* I.C. § 72–439 has remained unchanged since it was first enacted in 1939 and was first § 43–

2109 of the Idaho Code Annotated. *See* 1939 Idaho Sess.Laws, ch. 161, p. 290. On that same page also find § 43–2107, which, as I understand it, was a six-year transitory statute, after which it was of no effect. I do not tongue-in-check say *"see sec. 43–2107 in the Session Laws,"* because, if it has ever been re-enacted and is still extant statutory law, I am unable to find it in the Idaho Code. Justice Huntley discovered § 43–2107 after our opinions were released, and furnished the members of the Court with copies thereof. It provides:

> **43–2107. LAST EMPLOYER LIABLE—AMOUNT OF COMPENSATION.** Where compensation is payable for an occupational disease, the employer in whose employment the employee was last injuriously exposed to the hazards of such disease shall be liable therefor; the amount of the compensation shall be based upon the average weekly wages (as defined in the workmen's compensation law) of the employee when last so exposed under such employer; and the notice of disability and claim for compensation shall be given and made to such employer; provided, however, that the maximum compensation to be allowed for disability, or death, or both, on account of any occupational disease, other than silicosis, shall be $5,000.00, until *a transitory period of six years* from the date when this chapter becomes effective shall have expired, and thereafter the total aggregate of such compensation and benefits shall be as provided in the workmen's compensation law; provided further that in case of silicosis the only employer liable shall be the *last employer* in whose employment the employee was last injuriously exposed to the hazards of the disease during a period of sixty days or more after the effective date of this chapter. (Emphasis added.)

Doubters as to the validity of Justice Huntley's earlier opinion cannot read the foregoing without having their doubts eradicated. Just as he wrote, a purpose of the new occupational disease law was to indeed fix liability upon the last employer—thus avoiding complex and almost impossible ap-

portionment problems. Section 43–2107, taken together with § 43–2109, clearly establishes that, in determining who was the last employer, the requirement is a 60-day period of employment.

Moreover, § 43–2107 serves to completely obviate the philosophic worries which a majority of a 1985 Supreme Court are plagued with as to the workings of the 1939 legislature, particularly:

> Workers' compensation does not purport to be a social insurance program covering all a worker's health problems. The legislature has a legitimate interest in seeing that coverage for occupational diseases be kept within reasonable limits and in controlling the financial impact on Idaho industry and consumers. The legislature *might have determined* that these interests made it reasonable to establish a condition precedent of 60 days exposure before imposing liability for non-acute occupational diseases. The legislature *might also have determined that* it would be unfair to impose liability on employers for time-related diseases without imposing a corresponding time requirement on the employment relationship. (Emphasis added.)

Those speculative meanderings as to what the 1939 legislature *might* have intended have no genuine purpose in an opinion for the Court. It is readily seen from § 43–2107 that the 1939 legislature was able to determine for itself. First, observe that with a proper regard for the imposition of the new law upon industry, that a maximum limit of $5,000 was imposed, to be in effect for a six-year transitory period. This, together with the last employer provision was adequate—in the legislative mind—and served well in "controlling the financial impact on Idaho industry," the main concern of a 1985 majority of this Court.

This Court in its 1939 *McLean* decision undoubtedly did not perceive the mischief which it was working in misstating the law in order to avoid the difficult constitutional issue presented to it. The injury done to the working man or woman by that mischief has remained uncovered until the year 1985. This Court can now undo that mischief. A majority of the Court refuses to do so or explain any reasons. Two wrongs do not make a right.

HUNTLEY, J., concurs, and concurs also in the dissenting opinion of BISTLINE, J., of January 29, 1985.