778 P.2d 757

Harold C. MILES, Individually and on Behalf of all Ratepayers of the Idaho Power Company, Plaintiff–Appellant,

v.

IDAHO POWER COMPANY, a Maine Corporation, and the State of Idaho, Acting By and Through the Honorable John V. Evans, Governor, and Acting By and Through the Legislators of the State of Idaho; and the State of Idaho Acting By and Through the Idaho Public Utilities Commission, and Commissioners Richard High, Perry Swisher and Conley Ward in Their Official Capacities; and the State of Idaho, Acting By and Through the Idaho Department of Water Resources, the Idaho Water Resources Board, and its Executive Director, Ken Dunn, in his Official Capacity, Defendants–Respondents.

No. 16614.

Supreme Court of Idaho.

Aug. 8, 1989.

Seiniger & Nevin, Boise, for plaintiff-appellant. Breck Seiniger, Jr., argued.

Thomas G. Nelson, Twin Falls, for defendant-respondent, Idaho Power Co. Thomas G. Nelson, argued.

Jim Jones, Atty. Gen. and John J. McMahon, Deputy Atty. Gen., Boise, for defendant-respondent, State of Idaho. John J. McMahon, argued on rehearing.

JOHNSON, Justice.

## ON REHEARING

This case involves an agreement between the State of Idaho and Idaho Power Company (Idaho Power), commonly referred to as the Swan Falls Agreement (the agreement). The agreement and the subsequent implementing legislation attempted to resolve concerns over competing water rights in and around the Snake River. In brief, the agreement provided for the subordination of certain water rights claimed by Idaho Power to those of subsequent upstream users. The implementing legislation provided, among other things, that the Idaho Public Utilities Commission (IPUC) when "setting or reviewing the revenue require-

ment of any utility ... shall accept [the agreement] as reasonable and in the public interest for all purposes...." 1985 Idaho Sess.Laws ch. 14, § 3, p. 20. The appellant, Harold C. Miles, filed a declaratory judgment action on behalf of himself and all similarly situated Idaho Power ratepayers, seeking to have part of the implementing legislation declared unconstitutional.

This appeal followed an order of the district court dismissing the case pursuant to I.R.C.P. 12(b)(6) (1980) for failure to state a claim upon which relief could be granted. The district court did not reach the merits of Miles' challenge, finding instead that Miles lacked standing and that the controversy was not ripe for judicial resolution. Our standard for reviewing a Rule 12(b)(6) dismissal is the same as our summary judgment standard. *Tomchak v. Walker,* 108 Idaho 446, 700 P.2d 68 (1985). The non-moving party is entitled to have all inferences from the record viewed in his favor and only then may the question be asked whether a claim for relief has been stated.

We affirm the decision of the trial court, but on different grounds. We hold that the controversy is justiciable. We reject respondents' arguments regarding the political question, standing and ripeness doctrines. We also hold that the implementing legislation is not violative of the equal protection clause or due process clause of the fourteenth amendment to the Constitution of the United States. We decline to address the appellant's argument that the legislation violates the state constitution's proscription against special legislation because that question was not presented to the district court below.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS.

This is another case involving water rights in the Snake River at Swan Falls. A complete and extensive discussion of the history of this controversy is included in *Idaho Power Company v. State,* 104 Idaho 575, 661 P.2d 741 (1983).

To avoid multiple litigation between itself and thousands of water-permit holders of water rights in the Snake River, Idaho Power sought a compromise with the State. The ensuing discussions between the parties resulted in the agreement. Subsequently, our legislature enacted legislation to implement the agreement. *See* 1985 Idaho Sess.Laws, ch. 14–17; ch. 18, §§ 1, 3, 4; ch. 162, 204, pp. 20–31, 437, 514. The purpose of the agreement was to resolve the continuing controversies surrounding water rights on the Snake River. The agreement, among other things, called for Idaho Power's claim to Snake River water rights for its Swan Falls hydroelectric facility of 8,400 c.f.s. (measured at the Murphy gauging station) to be subordinated down to an average daily flow of 3,900 c.f.s. from April 1 to October 31, and of 5,600 c.f.s. from November 1 to March 31. The purpose of the agreement concerning subordination was to make available more water for future appropriators and to assist in the expansion of other beneficial uses of the water in the Snake River. *See* I.C. § 42–203B (Supp.1988). The focus of this litigation is on sections 2 and 3 of S.B. No. 1005, (the implementing legislation), enacted by the legislature and signed into law by the governor in 1985. 1985 Idaho Sess.Laws, ch. 14, §§ 2 and 3, p. 20, (not codified). These sections limit the jurisdiction of the IPUC by prohibiting it from considering whether Idaho Power could have protected its water rights and hydroelectric generation in a manner inconsistent with the agreement. They also required the IPUC, when reviewing revenue requirements of Idaho Power, to accept the agreement as reasonable and in the public interest.

Sections 2 and 3 read as follows:

SECTION 2. PUBLIC UTILITIES COMMISSION—JURISDICTION. The Idaho public utilities commission shall have no jurisdiction to consider in any proceeding, whether instituted before or after the effective date of this act, any issue as to whether any electric utility, including Idaho Power Company, should have or could have preserved, maintained or protected its water rights and hydroelectric generation in a manner inconsist-

ent with the contract entered into by the governor and the Idaho Power Company on October 25, 1984.

SECTION 3. EFFECT OF AGREE-MENT. In any proceeding before the Idaho public utilities commission including, but not limited to, a proceeding in which the commission is setting or reviewing the revenue requirement of any electric utility, including Idaho Power Company, the commission shall accept as reasonable and in the public interest for all purposes, the contract entered into by the governor and the Idaho Power Company on October 25, 1984, including without limitation, the effects of implementation of such contract on the utility's revenue requirements and hydroelectric generation.

Miles is a customer and ratepayer of Idaho Power. He brought a complaint in district court pursuant to the Uniform Declaratory Judgment Act, I.C. §§ 10-1201 to 10-1217 (1979) challenging the constitutionality of the implementing legislation. Specifically, the complaint alleged that the legislation precludes the IPUC from taking into account, when setting the rate base for Idaho Power, the company's diminished water rights and resulting reduced value of Idaho Power's generating facilities on the Snake River. Consequently, Miles alleged in his complaint "the combined effect of the 'Swan Falls Agreement' and the 'Swan Falls Legislation' is that the ratepayers will be required to pay rates for electricity to Idaho Power on a rate base (for facilities) that no longer exists or is substantially diminished in value, thus constituting a deprivation of property without due process of law and without just compensation."

Miles included the following illustration in his complaint:

### ILLUSTRATION (2)

Idaho Power Company originally had four turbines at the Brownlee Dam. Within the last several years it added the Brownlee No. 5 unit at a cost of $62,000,-000. Under the reduced flows of 5,600 c.f.s. and 3,900 c.f.s. the 5th unit would be rendered essentially valueless and useless because the first four turbines can handle most of the reduced flow, yet the "Swan Falls Agreement and Legislation" would leave the unit in the rate base and require the ratepayers to continue to pay a rate-of-return thereon.

He also alleged:

The excess and unconstitutional charges to be imposed upon the Idaho Power Company ratepayers will total many millions of dollars per year. The effect of the scheme propounded by the agreement and legislation is to take money from the ratepayer and give it to future appropriators (in the form of water) without compensation to the ratepayers.

Miles requested that the district court declare that:

(1) the implementing legislation limiting the IPUC jurisdiction be declared null and void;

(2) a mechanism be established to allow for compensation to Idaho Power ratepayers for all new and increased diversions from the Snake River system occurring on or after July 1, 1985;

(3) the Department of Water Resources be required to condition all the water permits issued on or after July 1, 1985, by requiring the appropriator to make payment (either by purchase or rental) to Idaho Power to compensate for decreased generating capacity caused by diversion; and

(4) the Idaho Public Utilities Commission be required to make appropriate rate adjustments to the Idaho Power rate base as necessary to compensate the ratepayers fully for increased power rates occasioned by the diversion.

Idaho Power and the State brought a motion to dismiss pursuant to I.R.C.P. 12(b) for failure to state a claim on which relief could be granted. After a hearing, the trial court issued an extensive memorandum decision which dismissed Miles' claims. Without discussing the merits, the trial court considered "the case or controversy requirements" of the standing, ripeness and political question doctrines. The trial

court concluded that Miles lacked standing, because he only stated a generalized grievance suffered by all Idaho Power ratepayers, and that the issue was not ripe for adjudication because Miles was not presently being deprived of any protectable property interest. The court ruled that no political question was presented because of our holding in *State AFL–CIO v. Leroy,* 110 Idaho 691, 718 P.2d 1129 (1986). Relying on the lack of ripeness and standing, the trial court determined that it did not have to rule on the merits and rendered summary judgment in favor of the defendants and ordered dismissal. Miles moved the court to alter or amend the judgment. The motion was denied. This appeal followed.

## II.

### JUSTICIABILITY.

Miles' request for relief is in the form of a declaratory judgment. A prerequisite to a declaratory judgment action is an actual or justiciable controversy. *Harris v. Cassia County,* 106 Idaho 513, 681 P.2d 988 (1984). Justiciability is generally divided into subcategories—advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions, and administrative questions. 13 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction,* § 3529 (2nd ed. 1984). Three categories considered by the district court and implicated in this appeal are the political question, standing and ripeness doctrines.

### A. Separation of Powers.

The respondents argue that the agreement, having been endorsed by the executive and legislative branches of this state's government, is an improper subject for judicial review. The argument is akin to the political question abstention doctrine of the federal court system, which is outlined in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). However, the issue is more correctly viewed under the doctrine of separation of powers, which is embraced in art. 2, § 1 of the Idaho Constitution. The question is whether this Court, by entertaining review of a particular matter, would be substituting its judgment for that of another coordinate branch of government, when the matter was one properly entrusted to that other branch. *Diefendorf v. Gallet,* 51 Idaho 619, 638, 10 P.2d 307, 315 (1932); *cf. Ransom v. Garden City,* 113 Idaho 202, 743 P.2d 70 (1987). In deciding such questions, we have relied upon the considerations described in *Baker v. Carr. See, e.g., Idaho State AFL–CIO v. Leroy,* 110 Idaho 691, 718 P.2d 1129 (1986).

In *Gallet,* a challenge had been made to the governor's finding that "an extraordinary occasion" existed and his invocation of the power to convene the legislature in special session pursuant to art. 4, § 9 of the Idaho Constitution. We were urged to hold that no such emergency existed and that the governor's convocation was contrary to law. After noting that the Idaho Constitution expressly left the responsibility and discretion with the governor for determining the existence of "extraordinary occasions," we declined the invitation to second-guess his decision:

It would be an unprecedented proceeding for the court to entertain a controversy wherein proof is offered to ascertain judicially whether an extraordinary occasion existed of sufficient gravity to authorize the governor to convene the legislature in extra session. The character of the legislation to be considered by the legislature was by the constitution left to the governor, and a review of such a discretionary act of the governor should not be done by the courts.

*Gallet,* 51 Idaho at 638, 10 P.2d at 315, *quoting Utah Power & Light Co. v. Pfost,* 52 F.2d 226, 231 (D.Idaho 1931).

Similarly, in *Leroy* we were asked to review a legislative declaration of emergency pursuant to art. 3, § 22 of the Idaho Constitution. After noting the "textually demonstrable constitutional commitment" of this power to the legislature, and the "lack of judicially discoverable and manageable standards" for resolving the problem of what conditions must exist to constitute a "case of emergency," we said:

Whether [an actual emergency exists] or not, we hold that the legislature's determination of an emergency in an act is a policy decision exclusively within the ambit of legislative authority, and the judiciary cannot second-guess that decision. In the absence of a legislative invasion of constitutionally protected rights, the judicial branch must respect and defer to the legislature's exclusive policy decisions. Such is the very nature of our tripartite representative form of government.

*Leroy,* 110 Idaho at 698, 718 P.2d at 1136.

Here, the advisability of the agreement is not a proper subject for judicial deliberation. The question involves "an initial policy determination of a kind clearly for non-judicial discretion." *Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. at 710. Determining how our scarce water resources will best serve the state, whether by increased agricultural use or increased power generation use, is a matter peculiarly within the legislative and executive branches. The executive branch, by entering into the agreement, and the legislative branch, by enacting implementing legislation, have each given approval to the water rights subordination plan. Both branches have declared that

> [the Swan Falls Agreement] is in the public interest for all purposes including, but not limited to, all purposes under the public utilities law, as amended. Implementation of the settlement will resolve continuing controversy over electric utility water rights in the Snake River Basin above Murphy U.S.G.S. gauging station. That controversy has rendered the amount of the water available for hydropower uncertain, thus placing at risk both the availability of lowcost hydropower to the ratepayers and the state's ability to manage an increasingly scarce resource. This settlement balances all of the parties' concerns and insures that existing hydropower-generating facilities will remain useful, that ratepayers will not be burdened with excessive costs, and that availability of water for addi-

tional domestic, manufacturing, and agricultural uses will judiciously expand.

1985 Idaho Sess.Laws, ch. 14, § 1.

Clearly then, it would be inappropriate for this Court to second-guess the merits of the agreement.

However, the question now before the Court is not whether the agreement is wise policy. Rather, the question before this Court is whether the implementing legislation violates the due process and equal protection guarantees of our constitution and of the United States Constitution. *Gallet* and *Leroy* are therefore distinguishable from the instant case, because here it is alleged that constitutionally protected rights have been invaded and that the legislature has acted in contravention of the state and federal constitutions.

■ Passing on the constitutionality of statutory enactments, even enactments with political overtones, is a fundamental responsibility of the judiciary, and has been so since *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1813). *See, e.g., Heller v. Cenarrusa,* 106 Idaho 586, 682 P.2d 539 (1984) (equal protection); and *Bint v. Creative Forest Products,* 108 Idaho 116, 697 P.2d 818, *appeal denied,* 474 U.S. 803, 106 S.Ct. 35, 88 L.Ed.2d 28 (1985) (due process). Furthermore, we are not precluded from reviewing the constitutionality of a proposed course of action merely because both the executive and legislative branches happen to concur in supporting it. Constitutional rights, as well as this Court's duty to faithfully interpret our constitution and the federal constitution, do not wane before united efforts of the legislature and the governor.

Therefore, we are not precluded from reviewing this appeal.

### B. STANDING.

The district court held that Miles lacked standing because he alleged only a generalized grievance, not particular to himself, but shared alike with the public. The district court, relying on *Greer v. Lewiston Golf & Country Club, Inc.,* 81 Idaho 393, 342 P.2d 719 (1959) and *Bopp v. City of*

*Sandpoint,* 110 Idaho 488, 716 P.2d 1260 (1986), ruled that a ratepayer, when using a declaratory judgment action to challenge the validity of a statute, must allege an interest other than one which is common to all other similarly situated ratepayers, namely, to all ratepayers of the same utility.

■■■ The doctrine of standing focuses on the party seeking relief and not on the issues the party wishes to have adjudicated. *Valley Forge College v. Americans United,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). While the doctrine is easily stated, it is imprecise and difficult in its application. *O'Hair v. White,* 675 F.2d 680 (Former 5th Cir.1982). However, the major aspect of standing has been explained:

> The essence of the standing inquiry is whether the party seeking to invoke the court's jurisdiction has "alleged such a personal stake in the outcome of the controversy as to assure the concrete adversariness which sharpens the presentation upon which the court so depends for illumination of difficult constitutional questions." As refined by subsequent reformation, this requirement of "personal stake" has come to be understood to require not only a "distinct palpable injury" to the plaintiff, but also a "fairly traceable" causal connection between the claimed injury and the challenged conduct. (Citations omitted.)

*Duke Power Co. v. Carolina Env. Study Group,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978).

Thus, to satisfy the case or controversy requirement of standing, litigants generally must allege or demonstrate an injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury. *Id.* at 79, 98 S.Ct. at 2633.

In some cases even though a plaintiff has shown or alleged an "injury in fact," standing is denied because of other factors. For example, the United States Supreme Court has held that "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

■■■ A central foundation of the Idaho Declaratory Judgment Act is the requirement of adverse parties. *Whitney v. Randall,* 58 Idaho 49, 70 P.2d 384 (1937). For the parties to be in an adversarial position, they must have such a personal stake in the outcome of the controversy that a meaningful representation and advocacy of the issues is ensured. The two leading cases on generalized standing in Idaho are *Greer* and *Bopp.*

In *Greer,* taxpayers and citizens of the city of Lewiston brought a declaratory judgment action challenging a city ordinance disannexing the Lewiston Golf and Country Club. The Court did not reach the merits, holding the plaintiffs did not have an interest particular to themselves, but instead had an interest shared by the public generally. The Court further ruled that the plaintiffs' personal rights were not affected and therefore they could not maintain a declaratory judgment action. Finally, the Court noted that the taxpayers' proper remedy was by way of referendum, as provided in the city charter.

In *Bopp,* the plaintiff, a citizen of the city of Sandpoint, brought a declaratory judgment action seeking to have a city ordinance vacating a public right-of-way over a bridge declared invalid. We held that the plaintiff could not contest the validity of the ordinance because he did not own any property adjacent to the bridge, and therefore, did not suffer a special or peculiar injury to himself. Any injury was one generally shared by all residents of the city of Sandpoint.

*Greer* and *Bopp* stand for the proposition that a citizen and taxpayer may not challenge a governmental enactment where the injury is one suffered alike by all citizens and taxpayers of the jurisdiction. In those situations the proper forum to reshape the challenged governmental policy is the political arena through the voting

process. The parties aggrieved by the policy stand on equal footing with the voting populace and can attempt to influence public opinion and bring about change. This is the essence of a democratic form of government.

■ This is not the case here. The parties allegedly injured by the agreement are the ratepayers and customers of Idaho Power, and not the general populace of the state of Idaho. This is more than a generalized grievance. It is a specialized and peculiar injury, although it may affect a large class of individuals. The political process obviously will be more unkind to injured ratepayers seeking to change legislation affecting the whole state of Idaho than to injured citizens and taxpayers. When the impact of legislation is not felt by the entire populace, but only by a selected class of citizens, the standing doctrine should not be evoked to usurp the right to challenge the alleged denial of constitutional rights in a judicial forum.

Nevertheless, the respondents urge us to invoke the doctrine because of the large class of Idaho Power ratepayers. They argue that Miles, as only one of thousands of customers, suffered a generalized injury, which, when compared to the benefits the compromise afforded to all of the people of Idaho is de minimis and insubstantial. This may be true, but we fail to see how this factor requires a dismissal upon lack of standing. "To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." *United States v. SCRAP*, 412 U.S. 669, 687–88, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973). This statement is particularly true here. There is no question that the agreement impacts Idaho Power ratepayers. The State and Idaho Power, as part of their agreement, have pledged "actively and in good faith" to recommend and support the implementing legislation. Idaho Power ratepayers are therefore the group most adverse to the agreement, not Idaho Power or the State. Because of that fact, and the fact

that Miles challenges the implementing legislation as a ratepayer, and not as a taxpayer, we hold that Miles has standing to pursue his remedy in the courts.

■ Finally, all parties, including the district court, appear to concede that Miles could have raised his complaint before the IPUC and argued before the IPUC that as a result of the agreement his rates were too high. Subsequently, after a commission ruling, Miles could then bring an appeal to this Court pursuant to I.C. § 61–627, and raise the constitutional issues. *See* I.C. § 61–629. Requiring Miles to begin this case anew before the IPUC and to then appeal from the decision of the IPUC would waste not only the resources of the judiciary, but also the IPUC's resources. The challenge is not to rate setting by IPUC, but to the implementing legislation, which directed the IPUC to accept the agreement as reasonable and in the public interest. Courts are generally a proper forum in which to challenge legislative enactments. The legislature has not attempted to remove from the jurisdiction of our trial courts challenges to IPUC-related legislation. *See* Idaho Const. art. 5, § 2. *But see* Idaho Const. art. 2, § 1 and art. 5, § 20. Therefore, initiation of the instant case in district court was not improper. We will not protract this action longer by requiring Miles to go to the IPUC and begin anew.

## C. RIPENESS.

■ *Harris v. Cassia County* held that a declaratory judgment action must raise issues that are definite and concrete, and must involve a real and substantial controversy as opposed to an advisory opinion based upon hypothetical facts. Ripeness asks whether there is any need for court action at the present time. In this case, the district court ruled that Miles' claims were not ripe because he was not presently being deprived of any protectable property interest. The district court reasoned that ratepayers do not have a constitutionally protected property interest in the assets of their utilities, and therefore, that no controversy will exist until the IPUC, acting pur-

suant to the implementing legislation, either grants a rate increase request to Idaho Power, or denies a rate decrease request to a ratepayer. We perceive that the trial court simply held that the alleged injury is too remote and uncertain to justify present adjudication.

Fundamentally, the complaint attacks a statute which dictates to an agency a certain course of action. There is no reason to believe that the IPUC will fail or refuse to follow the mandates of the statute when faced with a request either to increase rates or to decrease rates. If we were to dismiss this action for lack of ripeness, Miles could simply request a rate reduction before the IPUC. The IPUC, relying on the statute, would be required to deny the decrease, precipitating an appeal by Miles to this Court pursuant to I.C. § 61–627. No new facts would be introduced and the legal issues presented would be unchanged from the present challenge. The only contingency here is whether Miles would pursue his claim before the IPUC. Miles has prosecuted his claim in the district court and this Court with vigor. We can only assume that he would also proceed likewise before the IPUC. If the IPUC denied his requests for a rate reduction, Miles would be back before us presenting the same issue, not brought into sharper focus by being sidetracked to an administrative body. Deferring adjudication would add nothing material to the resolution of the legal issues presented, and it would, in fact, delay implementation of the agreement. "Generally, in determining whether to grant a declaratory judgment, the criteria is whether it will clarify and settle the legal relations at issue, and whether such declaration will afford a leave from uncertainty and controversy giving rise to the proceeding." *Sweeney v. Am. Nat'l Bk.*, 62 Idaho 544, 115 P.2d 109 (1941). Here, nothing can be gained by delaying adjudication of the issue. It is clear that this issue will be before us either now or in the future, and a declaration now of the various rights of the parties will certainly afford a relief from uncertainty and controversy in the future. "Since we are persuaded that 'we will be in no better position

than we are now' to decide this question, we hold that it is presently ripe for adjudication." *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. at 82, 98 S.Ct. at 2635.

### III.

### CONSTITUTIONALITY.

### A. DUE PROCESS.

Miles contends that the agreement and related legislation violate the due process provisions of the fourteenth amendment to the United States Constitution. The fourteenth amendment, section one, provides in part:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction equal protection of the laws.

Specifically, he argues that the effect of the agreement and the implementing legislation will require him and other ratepayers to pay rates based on the value of property not used in the production of electricity, since the IPUC will be deprived of jurisdiction to lower those rates when presented with a valid complaint. Miles contends that the due process clause of the fourteenth amendment is violated in two ways: (1) the implementing legislation requires the payment of the excessive rates which amounts to a taking of property without just compensation; and (2) the ratepayers are not afforded a procedure in which to challenge the action of the legislature.

At the heart of Miles' attack is an assumption that ratepayers have a protected property interest in the rates they pay to their utilities. Stated another way, Miles contends that the effect of the agreement and the implementing legislation will be to take from him, in the future, money that he will be required to pay for increased rates for electricity. It is this assumption upon which we must focus our initial inquiry.

The requirements for the establishment of a constitutionally protected property interest are set forth in the oft-quoted passage of *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972):

The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits....

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

*Id.* at 576–77, 92 S.Ct. at 2708–09.

*See Harkness v. City of Burley*, 110 Idaho 353, 715 P.2d 1283 (1986). *Roth* discussed property rights in relation to the notice and hearing requirements of procedural due process. However, we are convinced that the same determination of property applies to the taking issue raised by Miles. *See Royster v. Bd. of Trustees of Anderson Cty. Sch.*, 774 F.2d 618 (4th Cir.1985), *cert. denied*, 475 U.S. 1121, 106 S.Ct. 1638, 90 L.Ed.2d 184 (1986) (school superintendent's constitutionally protected property interest in his contract was satisfied by full compensation due under contract after his removal without a hearing). Thus, our determination now centers on whether Miles has a sufficient "property" interest or "legitimate claim of entitlement" in electrical rates so as to invoke the protection of the due process clause of the constitution.

Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.

■ Miles argues that I.C. § 61–523 gives ratepayers a protected property interest. This section states:

**61–523. Valuation.**—The commission shall have power to ascertain the value of the property of every public utility in this state and every fact which, in its judgment, may or does have any bearing[1] on such value. The commission shall have power to make re-valuations from time to time and to ascertain all new construction, extensions and additions to the property of every public utility.

We have never interpreted this statute to hold that it gives a ratepayer an entitlement to utility service at the lowest possible rates. The statute simply gives the IPUC the power to determine the value of the utility's property. The agreement does not alter this power of the IPUC. In any event, the legislature has plenary power over IPUC jurisdiction and can limit its authority. As we have stated in many instances: "The Idaho Public Utilities Commission has no authority other than that granted to it by the legislature. It exercises a limited jurisdiction, and nothing is presumed in favor of its jurisdiction." *Idaho State Homebuilders v. Washington Water Power*, 107 Idaho 415, 418, 690 P.2d 350, 353 (1984). Generally, the commission may consider all relevant criteria when setting rates, but the legislature can define what are relevant criteria. *Grindstone Butte v. Idaho P.U.C.*, 102 Idaho 175, 181, 627 P.2d 804, 810 (1981).

■ Our research has disclosed no case law that supports Miles' proposition of an entitlement to the lowest possible rates. In fact, there is contrary authority to suggest that ratepayers do not have a property interest protected by the due process clause in the rates paid for electricity. *See City of Pittsburgh v. Pennsylvania Pub.*

1. I.C. § 61–523 uses the word "hearing" instead of "bearing." As enacted, the statute uses the word "bearing" instead of "hearing." 1913 Idaho Sess.Laws, ch. 61, § 45, p. 275.

*Utils. Comm'n,* 187 Pa.Super. 341, 144 A.2d 648 (1958); *Georgia Power Project v. Georgia Power Co.,* 409 F.Supp. 332 (N.D. Ga.1975) (applying Georgia law); and *Public Service Co. v. Public Utilities Comm'n,* 653 P.2d 1117 (Colo.1982). As the court stated in *Georgia Power Project:*

> The plaintiffs have no sufficient "property" interest in a given utility rate increase to invoke the procedural protections of the due process clause of the Fourteenth Amendment. Undoubtedly, the plaintiffs as consumers of a product have an interest in paying a lesser rate for their electricity as opposed to a higher rate. It would be the rare bird indeed whose interest would be otherwise. And in the sense that an increase in rates means a deprivation of a monetary sum—a sum perhaps needed to purchase other necessities of life—the interest that plaintiffs have here is more than an "abstract need or desire" for lower rates.

409 F.Supp. at 340–41.

Miles has asked us to adopt the rationale of *State ex rel Knight v. Public Service Comm'n,* 161 W.Va. 447, 245 S.E.2d 144 (1978). In *Knight* the West Virginia court concluded that "there is a common law right to reasonable rates from any monopoly created by the state, and this right, having existed before the adoption of our constitution, would be encompassed within the concept of property protected by W.Va. Const., art. 3, § 10." 245 S.E.2d at 149. We reject this concept of property for Idaho. I.C. § 73–116 states:

> **73–116. Common law in force.**—The common law of England, so far as it is not repugnant to, or inconsistent with, the constitution or laws of the United States, in all cases not provided for in these compiled laws, is the rule of decision in all courts of this state.

Through the implementing legislation the legislature has prescribed factors that the IPUC may not consider in setting rates for electricity sold by Idaho Power. In *Grindstone Butte* we acknowledged that the legislature has the power to circumscribe the authority of the IPUC to consider "all relevant criteria" in setting rates. 102 Idaho

at 181, 627 P.2d at 810. Property interests are defined by state law. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. To the extent that there is any property interest in reasonable rates in Idaho, it is subject to the limitations placed on it by the legislature.

**B. EQUAL PROTECTION.**

Miles argues that the implementing legislation violates the equal protection clause of the fourteenth amendment to the United States Constitution. Of the three categories of equal protection analysis, "strict scrutiny" clearly does not apply. The legislation implicates neither a suspect classification nor a fundamental right. Arguably, the intermediate standard—"means focus"—applies since the implementing legislation can perhaps be characterized as discriminatory on its face or blatantly discriminatory. *See Gen. Telephone Co. v. Idaho Public Util.,* 109 Idaho 942, 946, 712 P.2d 643, 647 (1986); *Jones v. State Bd. of Medicine,* 97 Idaho 859, 555 P.2d 399 (1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). Under this intermediate standard of judicial scrutiny, the right to equal protection of laws is not violated if the classification "substantially furthers some specifically identifiable legislative end." *Jones,* 97 Idaho at 867, 555 P.2d at 407. The lowest level of scrutiny—"rational basis"—requires only that the classification be rationally related to legitimate governmental objectives. *Tarbox v. Tax Comm'n,* 107 Idaho 957, 960, 695 P.2d 342, 345 (1984). Under this minimal standard, "[a] statutory discrimination will not be set aside if any statement of facts may be reasonably conceived to justify it." *Jones,* 97 Idaho at 866, 555 P.2d at 406, *quoting McGowan v. Maryland,* 366 U.S. 420, 425–56, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

We will not split hairs deciding whether the legislation at issue falls within the intermediate or lowest level of judicial scrutiny because we find that the legislation satisfies the requirements of the intermediate test. Thus, the requirements of the rational basis test are a fortiori fulfilled. The water of this arid state is an important resource. Not only farmers, but industry

and residential users depend upon it. Facilitating the settlement of competing claims to our scarce supply of water is an important governmental objective. It is important that at this very moment an unprecedented judicial proceeding is underway to adjudicate all the water rights to the Snake River. The agreement and the implementing legislation is likewise important to this state because it settles a major and long-standing dispute over a significant volume of water. The legislation is substantially related to the objective of settling adverse claims to water. It "substantially furthers some specifically identifiable legislative end," and therefore does not violate the right to equal protection of the laws.

## IV.

## CONCLUSION.

For the foregoing reasons we find the present action justiciable. We hold that the implementing legislation does not violate the due process or equal protection guarantees of the United States or Idaho's constitutions. We do not address whether the implementing legislation was special legislation in violation of our constitution, since this question was not before the trial court.

The district court's dismissal of Miles' declaratory judgment action is affirmed.

No costs or attorney fees on appeal.

WALTERS, J., Pro Tem., concurs.

BAKES, C.J., specially concurs.

SHEPARD, J., sat, but did not participate in the opinion due to his untimely death.

BAKES, Chief Justice, concurring specially:

The majority opinion concludes that there was no violation of the equal protection clause under any of the three standards for equal protection analysis: (1) "strict scrutiny," (2) "means-focus," and (3) "rational basis." I agree that applying any of those

three standards in this case would result in affirming the district court's decision.

I write to point out only that I don't believe that the complaint in this case properly raises an equal protection argument and thus there is really no need to analyze this case under any of the three standards set out above. The decisions of the United States Supreme Court and the Courts of Appeals make it clear that when a state statute or state action is attacked on the ground that it denies equal protection under the fourteenth amendment to the United States Constitution, the courts must make a three-part analysis to determine (1) whether the law treats the plaintiff differently than others, (2) whether the plaintiff is "similarly situated" to those others, and only then determine whether (3) the different treatment is justified under the appropriate applicable standard—"strict scrutiny," "means-focus," or "rational basis." *Rinaldi v. Yeager*, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966); *Desris v. City of Kenosha, Wisconsin*, 687 F.2d 1117 (7th Cir.1982). Miles' complaint has not properly raised an equal protection claim. While the Court's opinion points, *ante* at 637, 778 P.2d 759, that Miles is "similarly situated" to the other ratepayers because he is one, the agreement between the State of Idaho and Idaho Power Company does not treat Miles any differently than it does any other ratepayers. Accordingly, in my view, there is no equal protection issue raised in this case and it is unnecessary to make either a "strict scrutiny," "means-focus," or a "rational basis" analysis.

BISTLINE, Justice, concurring and concurring in result.

I concur in the reasoning and result of the majority opinion, Parts I and II. As to the constitutional arguments contained in Part III, I concur only in the result, but not in the rationale or analysis of that section.

The majority totally mischaracterizes the critical point in Miles' constitutional argument. Justice Johnson writes the following: "At the heart of the Miles' attack is an assumption that ratepayers have a protected interest in the rates they pay to their utilities." 116 Idaho at 643, 778 P.2d at

765. "Miles argues that I.C. § 61–523 gives ratepayers a protected property interest." 116 Idaho at 644, 778 P.2d at 766. "Our research has disclosed no case law that supports Miles proposition of an entitlement to the lowest possible rates." 116 Idaho at 644, 778 P.2d at 766.

Miles' brief in support of his petition for rehearing objected to the majority's creation of this straw man:

Appellant has filed herewith a petition for rehearing. It is respectfully submitted that this Court has misconceived the interests which appellant claims are violated by the legislation in question. This Court was apparently unimpressed by the appellant's constitutional attack upon the 'Swan Falls' legislation, because it believed that the appellant was contending that he (and all other ratepayers) was entitled to the 'lowest possible electric rates.' This mischaracterization of the appellant's position led inevitably, and understandably, to the rejection of the constitutional claims.

It must be understood that the appellant contends only that:

(1) The appellant has a property interest in his own funds, whether they be his savings or his future earnings;

(2) The State of Idaho cannot require a ratepayer to pay his money to any utility unless he is given value in the form of service or other consideration; can it require a ratepayer to pay more than the services are reasonably worth;

(3) The Swan Falls legislation mandates that the PUC allow Idaho Power to charge its ratepayers for power which will not be provided when full subordination of water rights on the Snake River renders a substantial portion of the present rate base useless; (this occurs because the PUC is prohibited from considering the reduction of usefulness of the hydro-electric plant resulting from Idaho Power's agreement to subordinate (give away) a major portion of its Snake River water rights);

(4) Charging electrical rates on a non-existing rate base is functionally equivalent to charging for electrical service which is not furnished, since the diminished generating capacity *must not be deducted from the rate base,* pursuant to legislative mandate;

(5) In effect, the legislation takes appellants money without just compensation or due process of law, since the PUC is required to ignore reality in setting rates. The legislatively mandated arbitrarily high rates are a disguised purchase of the subordinated water rights from Idaho Power for the benefit of all taxpayers in general, and agricultural interests in particular, which the ratepayers are paying for. What does this agreement come down to if not a purchase of water rights of Idaho Power to the Snake River? Idaho Power loses nothing by the Swan Falls agreement, since it can charge rates which include the lost water rights and the full former value of its hydro-electric plant forever.

Petitioner's Brief in Support of Rehearing, pp. 2–4.

Stated succinctly the key issue unaddressed by the majority is this—if ratepayers can be required by this state's legislature to pay a rate on a plant that is not used and useful, has an unconstitutional taking occurred?

I have no argument that the legislature, having created the Idaho Public Utilities Commission, may limit its jurisdiction and may define the relevant criteria for rate making. Unlike the majority, however, I recognize that despite the plenary power of the legislature over the IPUC, the legislature cannot act unconstitutionally even if in concert with, as here, the executive branch and a state-regulated monopoly. This point was well-stated in a recent opinion of our nation's highest court:

It cannot seriously be contended that the Constitution prevents state legislatures from giving specific instructions to their utility commissions. We have never doubted that state legislatures are competent bodies to set utility rates. And the Pennsylvania PUC is essentially an administrative arm of the legislature. See, *e.g., Barasch v. Pennsylvania PUC,* 516 Pa. [142], at 171, 532 A.2d [325] at

339 ('The Commission is but an instrumentality of the state legislature for the performance of [rate making]'); *Minnesota Rate Cases*, 230 U.S. 352, 433, 33 S.Ct. 729, 754, 57 L.Ed. 1511 (1913) ('The rate-making power is a legislative power and necessarily implies a range of legislative discretion'). We stated in *Permian Basin [Area Rate cases]* that the commission 'must be free, within the limitations imposed by pertinent constitutional and *statutory commands*, to devise methods of regulation capable of equitably reconciling diverse and conflicting interest.' 390 U.S. [747], at 767, 88 S.Ct. [1344], at 1360 [20 L.Ed.2d 312] (emphasis added). *This is not to say that any system of ratemaking applied by a utilities commission, including the specific instructions it has received from its legislature, will necessarily be constitutional.* But if the system fails to pass muster, it will not be because the legislature has performed part of the work.

*Duquesne Light Co. v. Barasch,* —— U.S. ——, 109 S.Ct. 609, 618–19, 102 L.Ed.2d 646 (1989) (emphasis added).

The legislature, nor any other branch of government, may not take private property for public use without paying just compensation. U.S. Const., 5th Amend.; Idaho Const., art. 1, § 14. *See, State ex rel. Andrus v. Click,* 97 Idaho 791, 554 P.2d 969 (1976).

However, the respondent's brief on rehearing, authored by Chief Deputy Attorney General John McMahon, is persuasive of the likelihood that a "taking" has not occurred in this case. The $14 million figure advanced by Miles is derived from a study produced at the University of Idaho. This study was countered by another emanating from Boise State University. Each study is based upon certain assumptions.

The Chief Deputy Attorney General's brief points out that several key assumptions of the University of Idaho study may not be realistic:

The legislature had before it, essentially, a battle of experts regarding the likely impact of the Swan Falls Agreement. The Hamilton & Lyman ('H & L' study from the University of Idaho was countered by the McGrath study from Boise State University. The H & L study calculated $14 million in lost generation to ratepayers, based on its assumption that 195,000 new acres of farmland would come under irrigation by the year 2000.[2]

By contrast, the McGrath study before the legislature asserted:

In fact, new land will only be brought under irrigation if it is profitable to do so. If H & L's assumption of low farm revenues and high farm costs until 2000 were to hold true, *it is just as plausible to argue that net new entry might be zero.* In that case, the economic benefits and costs of subordination disappear....

McGrath study, Appendix A, p. 15 (emphasis added).

A second area of contention between the experts before the legislature was the impact of any rate increase on consumption. The H & L study assumed that usage of electricity is 'inelastic,' i.e., that people consume the same amount regardless of price increases. The McGrath study severely criticized this assumption:

it was formerly assumed that the demand for electricity and other forms of energy was price inelastic. The experience of the past 10 or 15 years has taught us the inaccuracy of that assumption. Secondly, it is obvious that, whatever the price elasticity of the electricity demand is, it will be greater over the long-run, since the possibility of conservation or substitution grows over time.

McGrath, Appendix A at 4. McGrath's study ran two different scenarios regard-

---

**2.** Miles understands the derivation of the $14 million number in the H & L study. The number was not derived from an assumed drawdown of the river to 3,300 c.f.s. at the Murphy gage. (Miles Complaint, R., p. 7.) Instead, the H & L study calculates $14 million in lost generating capacity on the assumption that 195,000 acres of land will come under irrigation because of the Swan Falls Agreement.

ing likely reactions to rate increases and concluded:

> The main point illustrated by both Cases A and B is that if the long-run price elasticity of electricity demand in Idaho is something greater than 0, then *H & L have seriously over-estimated both the cost of subordinating hydroelectric power water rights at Swan Falls and the rate increase necessary to cover replacement of new generation costs.*

McGrath, Appendix A at 10 (emphasis added).

A final factor of critical importance in the battle of the experts before the Idaho Legislature was the cost of the power needed to replace the allegedly 'lost generating capacity.' H & L assumed in their 1983 study that the cost of replacement power would be 6.353 cents per kilowatt hour. R., p. 130. It was this number times the assumed lost generation of 224,100 million kilowatt hours of electricity that led to the estimated replacement cost of $14,237,000. Table 4–8, R., p. 131.

McGrath made the obvious point that Idaho Power was in a power surplus and 'currently sells for resale about 31% of its total electric generation' (not counting the Valmy II unit, which was due to come on line the following year). McGrath, Appendix A at 16. The result, of course, was that Idaho Power's avoided cost was significantly less than the 6.4 ¢/kwh assumed by H & L in arriving at their $14 million number. In fact, by the 1985 legislative session, Idaho Power had filed to lower its avoided cost payment number and the PUC soon thereafter lowered the avoided cost number to 4.4

¢/kwh. Commission Order No. 19673 (May 5, 1985).[3]

The point of this discussion is not to entice the Court into resolving disputed issues of material fact. Nor is it to ask the Court, in hindsight, to determine which of the experts had the better crystal ball.[4] Rather, it is simply to place before the Court a small portion of the evidence that was weighed by the Idaho Legislature. That evidence dealt with such difficult issues as: the likelihood of future agricultural development; the methods of future irrigation (gravity vs. high lift); the per-acre water demand of different crops; the location along the river of likely development; the market for crops produced; the general health of the U.S. economy and its ability to control inflation; and federal policies on such matters as set-aside programs, commodity price support levels, tax incentives and the use of food as a weapon in international diplomacy. The Idaho Legislature weighed the information available to it and concluded that the Swan Falls Agreement 'is in the public interest for all purposes ...' 1985 Idaho Sess. Laws, ch. 14, § 1, p. 20.

Respondent's Brief on Rehearing, 38–41.

In addition, respondent's brief details several benefits accruing to the rate payers as a result of the Swan Falls legislation:

> The legislature was keenly aware of the interest of the ratepayers. It expressly stated that the agreement and legislation were an effort to resolve a controversy that put at risk 'the availability of low-cost hydropower *to the ratepayers.*' 1985 Idaho Sess. laws, ch. 14, § 1, p. 20 (emphasis added). The settlement, according to the legislature:

**3.** The avoided cost number now stands at 3.9 ¢/kwh, as set by Commission Order No. 21630 (December 2, 1987).

**4.** In fact, McGrath had the better crystal ball. The number of acres in farm production has declined in Idaho each and every year since the Swan Falls Agreement was signed. In 1984, 14,700,00 acres were devoted to farming in Idaho. In 1985, the acreage dropped to 14,500,000. In 1986, the acreage dropped to 14,200,000. In

1987, the last year for which figures are published, the acreage dropped again to 13,800,000. See Idaho Department of Agriculture, *1988 Idaho Agricultural Statistics* 10. The figures must, of course, be viewed with caution since they do not break out acreage between irrigated and non-irrigated land. Still, it is clear that the rapid development of new farmland that Hamilton and Lyman predicted would result from the Swan Falls Agreement has not come to pass.

balances all of the parties' concerns and ensures that existing hydropower-generating facilities will remain useful [and] that *ratepayers will not be burdened with excessive costs* ...

*Id.* (emphasis added). A careful reading of the legislative history demonstrates that the ratepayers received a current, concrete *quid pro quo* in exchange for the detriment they might suffer from diminished hydropower production under a series of speculative and hypothetical conditions that could possibly lead to future potential rate increases of $14 million.[5]

First, we must not forget the conditions that prevailed in 1985. Idaho Power Company had sued some 7,500 irrigators in an effort to carry out this Court's decision that the trial court, on remand, determine whether the company had abandoned or forfeited its water rights or was otherwise estopped from asserting said rights. The result was the largest lawsuit in Idaho's history. Its scope paralleled the Snake River adjudication itself, which the legislature had estimated would cost a total of $27,369,000. *See* Minutes, House Resources and Conservation Committee, January 17, 1985. Under traditional principles of ratemaking, legal expenses incurred by a utility in carrying out a court order or in an effort to protect its property, are a valid ratepayer expense. *The legislature's approval of the Swan Falls settlement put that cost where it belonged: on the owners of the affected water rights, not on the ratepayers of Idaho Power Compa-*

*ny.* In doing so, the legislature created an orderly Snake River adjudication process, thus allowing the money to be spent just once in a coordinated effort, not three times—once by Idaho Power, once by the 7,500 defendants, and once by the state itself as an interested party.

A second benefit to the ratepayers was the concession made by Idaho Power that '*[t]he gain upon sale of a public utility's water right used for the generation of electricity shall accrue to the benefit of the ratepayers.*' Idaho Code § 61–502B (Supp.1988). Testifying before the Senate Resources and Environment Committee on January 18, 1985, PUC Commissioner Richard High, as reported in committee minutes, stated:

This legislation I feel is extremely essential because in effect it clarifies the legal status of gains of sales and dedicates the benefits of these sales to the customers of the company rather than the shareholders of the company. It, in fact, sets the title of the water in the ratepayers rather than the shareholders. Whatever happens to the other bills, that one should pass.

Dedicating the gains from future water sales to ratepayers was a major concession since water rights *do* carry a high market value and because prior Idaho law apparently provided that such sales inure to the benefit of stockholders, not ratepayers. *See, Boise Water Corp. v. Idaho Public Utilities Comm'n.*, 99 Idaho 158, 578 P.2d 1089 (1978) (gain on sale of real estate belongs to stockholders).[6]

---

**5.** Miles mistakenly assumed the $14 million impact would be felt immediately upon passage of the Swan Falls legislation. Rather, the H & L study runs three different scenarios for timing of the additional 195,000 acres: (1) immediately, (2) by the year 1990, and (3) by the year 2000. *See* Table 4–8, R., p. 131. The Court may also take judicial notice of the fact that the Swan Falls legislation endorses a 'staged development policy' limiting proposed development to 'twenty thousand (20,000) acres per year or eighty thousand (80,000) acres in any four (4) year period.' Idaho Code § 42–203C. Under this 'cap on agricultural development,' Statement of Legislative Intent, 1985 Senate Journal, p. 60, development of 195,000 acres of new irrigated land could not occur until approxi-

mately 10 years after 1985, or until the year 1995 at the earliest.

**6.** According to Miles' rehearing brief, '*Water rights are part of the rate base upon which Idaho Power earns a return,*' and, again, '*Present market value of the water right is a proper element to be taken into consideration in ascertaining value of water plant for rate-making purposes.*' Reh.Br., p. 16 (emphasis in original). In fact, water rights are *not* part of an electric utility's element in ascertaining plant value for rate-making purposes. As discussed in section II, supra, the cases Miles relies upon for his assertions to the contrary date back to the era when plants were 'valued' at their reproduction cost. For approximately the last 50 years, that stan-

A third issue identified by the legislature as a benefit to all ratepayers was resolution of the 'controversy [that] has rendered the amount of the water available for hydropower uncertain . . .' 1985 Idaho Sess.Laws, ch. 14, p. 20. It must be remembered that when the Swan Falls litigation commenced in 1977, Idaho Power sought permission from the PUC to institute an embargo on all major hookups upstream from Swan Falls. This rare exemption from a utility's 'duty to serve' was authorized by PUC Order No. 14595, issued April 21, 1979. The resulting hardship primarily affected irrigators, but threatened large scale residential developments as well after commencement of the '7,500 lawsuit.'

A fourth benefit conferred upon the ratepayers was the imposition of a 'public interest' test upon all future water appropriations. Future water right applications must be measured against the public's interest in the:

> economic impact the proposed use would have upon electric utility rates in the state of Idaho, and the availability, foreseeability and cost of alternative energy sources to ameliorate such impact.

Idaho Code § 42–203C(1)(ii) (Supp.1988). Thus, for the first time in Idaho's history, a forum was created in which the competing interests of irrigation and hydropower could be rationally weighed as to which better represents the beneficial use of water.

Yet another beneficiary of the new 'public interest' criterion, is the small family farmer. It is not clear whether Miles would rank this group among the co-conspirators who created the Swan Falls Agreement and legislation, or whether they would be ranked among fellow oppressed ratepayers. In any case, the 'public interest' criterion, for the first time, endorses 'promotion of the family farming tradition' in considering new rate appropriation applications. Idaho Code § 42–203C(2)(iii).

It must also be stressed, contrary to Miles' assumption, that the ratepayers in 1985 were *not* on a plateau with no place to go but up. On the contrary, the utility's ultimate nightmare had not yet been adjudicated. That nightmare—shared by alert ratepayers—was that the 1928 amendment to the water law provisions of the Idaho Constitution had never yet been construed by the Idaho Supreme Court. That amendment states that Idaho's first-in-time-first-in-right constitutional water system is subject to the condition that 'the state may regulate and limit the use therefor for power purposes.' Parties to the '7,500 lawsuit' were prepared to argue that that language was self-enacting and should be construed to mean that the utility's water rights were subject to a state power to 'regulate and limit.' Similarly, in an Amended Answer and Counter-claim, the argument was made that Idaho Power had waived and was estopped to assert its water rights against upstream irrigators. *If any of these arguments had prevailed, the power company and its ratepayers would have had no protection at all.*

The Swan Falls Agreement and accompanying legislation puts an end to all such uncertainty. As a matter of state policy, it *raises* the minimum stream flow at Swan Falls from 3,300 c.f.s. to 3,900/5,600 c.f.s., which will have 'minimal effect on summer flows at Swan Falls.' R., p. 89. This is good news for ratepayers. It is also good news for environmentalists, of which Mr. Miles is surely one. [Footnote omitted.] Henceforth, as a matter of state policy endorsed by both the Idaho Water Resources Board and the Idaho State Legislature, a much larger supply of water is guaranteed to flow through Hells Canyon and down the Columbia River, doing its part to aid Idaho's anadromous fish runs.

Respondent's Brief on Rehearing, 24–28.

With admitted high regard for the capabilities of the author of the foregoing, and

---

dard has been replaced by ratemaking based on original-cost-less-depreciation. Since the utility stockholders pay nothing but a filing fee for the water right, the right does not show up as an asset on the company's books and thus forms no part of the company's rate base.

being well aware of the research and study made in making that fair and dispassionate presentation, presently I am not persuaded that a "taking" has occurred as claimed. Therefore, I concur only in the result reached by the majority in its holding that the Swan Falls legislation survives constitutional scrutiny.