# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 38735

SYRINGA NETWORKS, LLC, an Idaho
limited liability company,

    Plaintiff-Appellant,

v.

IDAHO DEPARTMENT OF
ADMINISTRATION; J. MICHAEL
"MIKE" GWARTNEY, in his personal and
official capacity as Director and Chief
Information Officer of the Idaho Department
of Administration; JACK G. "GREG"
ZICKAU, in his personal and official
capacity as Chief Technology Officer and
Administrator of the Office of the CIO;
ENA SERVICES, LLC, a Division of
Education Networks of America, Inc., a
Delaware corporation; QWEST
COMMUNICATIONS COMPANY, LLC, a
Delaware limited liability company,

    Defendants-Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, February 2013 Term

2013 Opinion No. 35

Filed: March 29, 2013

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County. The Hon. Patrick H. Owen, District Judge.

The judgment of the district court is <u>vacated</u> <u>in</u> <u>part</u> and <u>affirmed</u> <u>in</u> <u>part</u>.

David R. Lombardi, Givens Pursley, Boise, argued for Syringa Networks.

Steven F. Schossberger, Hawley Troxell Ennis & Hawley, Boise, argued for Idaho Department of Administration, J. Michael Gwartney, and Jack G. Zickau.

Phillip S. Oberrecht, Greener Burke Shoemaker Oberrecht, Boise, argued for ENA Services.

Steven J. Perfrement, Holme Roberts & Owen, Denver, Colorado, argued for Qwest Communications Co.

EISMANN, Justice.

This is an appeal out of Ada County from a judgment dismissing an action challenging the bidding process for the Idaho Education Network. We affirm the dismissal of all claims except the claim contending that the bidding process violated the statutes governing purchases by the division of purchasing. We remand this case for further proceedings consistent with this opinion.

## I.

### Factual Background.

In 2008, the legislature enacted legislation to establish the Idaho Education Network (IEN), which is to be a high-bandwidth telecommunications distribution system for distance learning in every public school in the state. Ch. 260, § 3, 2008 Idaho Sess. Laws 753, 754. The Department of Administration (Department) was given administrative oversight of the IEN, including "[p]rocur[ing] telecommunications services and equipment for the IEN through an open and competitive bidding process." I.C. § 67-5745D(5)(h).

On December 15, 2008, the Department issued a Request for Proposals (RFP) to purchase goods and services for the first phase in establishing the IEN, which is to "connect each public high school with a scalable, high-bandwidth connection, including connections to institutions of higher education as necessary." Subsequent phases would include connecting each elementary and middle school, connecting libraries, and connecting state agencies. The closing date for submitting proposals was January 12, 2009, at 5:00 p.m. Any proposal submitted in response to the RFP had to be in writing and, pursuant to the terms of the RFP, was considered "an offer to perform a contract in full response to the request for proposals," which had to remain valid for 180 days after the scheduled closing date for submitting proposals.

The Department held a bidders conference on December 29, 2008, to solicit questions and input regarding the RFP. It then issued a written statement of questions asked and the answers to those questions. One of the questions was whether this was a single or multiple award contract, and the Department responded that it was a multiple award contract of five years with three five-year extensions for a total of twenty years. Another question was whether it was

permissible to bring in an out-of-state partner, and the answer was, "Yes, we need to establish partnerships, both inside and outside of our state as applicable."

The Department issued an amendment to the RFP on January 6, 2009, which stated that the contract would be for a five year period, with three extensions of five years each. It also issued a list of written questions that had been submitted after the bidders conference, with answers to those questions. One of the questions asked about apparently conflicting statements in the RFP which were that the contract "will be awarded to up to four providers" and that "highest consideration will be given to the Partner or Partners presenting the best and most cost effective 'total end-to-end service support solution' and supporting network architecture." The Department answered that while "the State reserves the right to make multiple awards, it is the State's preference to choose a single response that represents comprehensive partnerships and coverage but still provides a single point of accountability per end user community." Another question asked who would coordinate the development, outsourcing, and implementation of the statewide network if multiple vendors are selected, and the Department answered that "it is still the desire of the State to contract with a single end-to-end managed internet service provider with existing partners and\or a willingness to form partnerships."

Syringa Networks, LLC (Syringa), is an Idaho telecommunications company. On January 7, 2009, it entered into a "teaming agreement" with ENA Services, LLC (ENA), a Tennessee company that specializes in providing education network services. Pursuant to their agreement, ENA submitted a proposal in response to the RFP, although the cover letter stated that both ENA and Syringa were responding jointly to the proposal. Qwest Communications Company, LLC (Qwest), and Verizon Business Network Services, Inc., also submitted responsive proposals.

The proposals were then scored based upon six specific criteria, with the maximum possible score being 1000 points. The ENA and Qwest proposals received the highest scores, with ENA's proposal being given a score of 856 and Qwest's proposal being given a score of 635. On January 20, 2009, the Department issued a letter of intent to award contracts to Qwest and ENA. On January 28, 2009, the Department issued statewide blanket purchase orders to Qwest and ENA, with each of them having the same scope of work. One month later, it issued amendments to the two purchase orders to alter the scope of work that each would perform. Qwest became "the general contractor for all IEN technical network services" (providing the

"backbone") and ENA became "the Service Provider listed on the State's Federal E-rate Form 471" and was to "coordinate overall delivery of all IEN network services and support." The effect of these amendments was to make Qwest the exclusive provider of the backbone, which is what Syringa intended to provide as a subcontractor of ENA.

On December 15, 2009, Syringa filed this lawsuit against the Department; its director, J. Michael Gwartney; Jack G. Zickau, the chief technology officer; ENA; and Qwest. Syringa sued the individuals in both their individual and official capacities. The district court ultimately dismissed Syringa's lawsuit against all of the Defendants on their respective motions for summary judgment. Syringa timely appealed the grants of summary judgment, and the State Defendants timely cross-appealed the refusal to award them attorney fees.

## II.

### Did the District Court Err in Dismissing Syringa's Challenge to Qwest's Amended Purchase Order for Failure to Exhaust Administrative Remedies?

For competitively bid contracts, the administrator of the division of purchasing must provide a notice that "describe[s] the property to be acquired in sufficient detail to apprise a bidder of the exact nature or functionality of the property required." I.C. § 67-5718(2). "Property" is defined as "[g]oods, services, parts, supplies and equipment, both tangible and intangible, including, but nonexclusively, designs, plans, programs, systems, techniques and any rights and interests in such property." I.C. § 67-5716(3). The contract is to be awarded to the lowest responsible bidder, I.C. § 67-5718(4), as determined by the administrator, I.C. § 67-5717(3).

However, the administrator "may make an award of a contract to two (2) or more bidders to furnish the same or similar property where more than one (1) contractor is necessary." I.C. § 67-5718A(1). To do so, the administrator must make a written determination that it is necessary to award the contract to more than one contractor in order to (a) "furnish the types of property and quantities required by state agencies"; or (b) "provide expeditious and cost-efficient acquisition of property for state agencies"; or (c) "enable state agencies to acquire property which is compatible with property previously acquired." I.C. § 67-5718A(1) & (2). All contracts made in violation of these statutes are void and any money advanced by the State in consideration of such contracts must be repaid. I.C. § 67-5725.

4

The initial contracts awarded to ENA and Qwest on January 28, 2009, constituted an award to two bidders to furnish the same or similar property. The material provisions of their contracts were identical. There was no differentiation as to the scope of work each was to perform under their respective contracts. However, the administrator did not make the required written determination to award the contract to two bidders until after Syringa requested a copy of that determination. In response to Syringa's public records request for the required written determination, the administrator sent a letter dated June 30, 2009, to a deputy attorney general stating that on December 3, 2008, he had a discussion with the state purchasing manager and they "agreed that no one vendor had the capability to service the State of Idaho and its geography to enable the network." The administrator's letter concluded: "At that time, I did not document this decision in writing. Please accept this statement as that written determination." On February 22, 2010, the administrator issued a formal written determination that two of the required criteria were met ((a) and (b) quoted above). That determination was based upon the administrator's finding that "no one vendor had the capability to service the State of Idaho ('State') and its geography to enable the network." On appeal, Syringa does not challenge the multiple award.

Although the written determination indicated that the decision to award two contracts was based upon Idaho's geography, the Department decided not to divide the work to be done by ENA and Qwest geographically. On February 26, 2009, the administrator issued change orders with respect to ENA's and Qwest's contracts. Qwest became the statewide provider of the backbone, and ENA became the statewide E-rate service provider. With that change, ENA and Qwest were no longer providing the same or similar property under their respective contracts. Qwest became the exclusive provider of what Syringa was to provide as a subcontractor of ENA.

Syringa sought to challenge the amended contracts. The State Defendants (the Department and Messrs. Gwartney and Zickau) moved for summary judgment with respect to this count on the ground that Syringa did not have standing to challenge the amended awards, and, if it had standing, it failed to exhaust its administrative remedies under Idaho Code section 67-5733. The district court held that Syringa had standing, but failed to exhaust its administrative remedies under section 67-5733. On appeal, the State Defendants contend that Syringa both lacked standing and failed to exhaust its administrative remedies.

5

**a. Syringa has standing.** "The doctrine of standing focuses on the party seeking relief and not on the issues the party wishes to have adjudicated." *Miles v. Idaho Power Co.*, 116 Idaho 635, 641, 778 P.2d 757, 763 (1989). To satisfy the requirement of standing, "litigants generally must allege or demonstrate an injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury." *Id.* "The injury must be distinct and palpable and not be one suffered alike by all citizens in the jurisdiction." *Selkirk–Priest Basin Ass'n, Inc. v. State ex rel. Batt*, 128 Idaho 831, 833–34, 919 P.2d 1032, 1034–35 (1996). There must also be a fairly traceable causal connection between the claimed injury and the challenged conduct. *Young v. City of Ketchum*, 137 Idaho 102, 104, 44 P.3d 1157, 1159 (2002). "An interest, as a concerned citizen, in seeing that the government abides by the law does not confer standing." *Troutner v. Kempthorne*, 142 Idaho 389, 391, 128 P.3d 926, 928 (2006).

When the amendments to the contracts issued to Qwest and ENA are viewed in isolation, Syringa does not have standing to challenge them. It is not a party to either contract. Its position as an intended subcontractor of ENA does not make it a party to ENA's contract with the State, nor does it create privity of contract with the State. *Hobson Fabricating Corp. v. SE/Z Constr., LLC*, WL 6601809, at *4 (Idaho Dec. 19, 2012). However, when the amendments to the contracts are viewed in the context of the entire bidding process, Syringa does have standing.

Idaho Code section 67-5718A(1) allows the State to award contracts to multiple bidders "to furnish the same or similar property" where more than one contractor is necessary for a statutorily specified reason. It is apparent from the record that the State Defendants believed that the statute only controlled the initial award to multiple bidders. If they were initially awarded contracts to furnish the same or similar property, amending those contracts so that the successful bidders were no longer furnishing the same or similar property would not violate the statute. They believed the State could do in two steps what was prohibited in one.[1]

A government agency may not do indirectly what it is prevented by law from doing directly. *See O'Bryant v. City of Idaho Falls*, 78 Idaho 313, 325, 303 P.2d 672, 678 (1956)

---

[1] The RFP stated: "All purchases, leases, or contracts which are based on competitive proposals will be awarded according to the provisions in the Request for Proposal. *The State reserves the right to reject any or all proposals, wholly or in part, or to award to multiple bidders in whole or in part.*" (Emphasis added.) This provision would not negate the requirement of Idaho Code section 67-5718A(1) that awarding a contract to multiple bidders must be to furnish the same or similar property.

("What cannot be done directly by the City of Idaho Falls because of constitutional limitations cannot be accomplished indirectly."). If the State could circumvent the statute simply by amending the contracts awarded to multiple bidders, then the statute would be of no effect. That two-step approach is obviously not permissible when considered in light of subsection (3) of the statute, which states, "Where a contract for property has been awarded to two (2) or more bidders in accordance with this section, a state agency shall make purchases from the contractor whose terms and conditions regarding price, availability, support services and delivery are most advantageous to the agency." I.C. § 67-5718A(3). Subsection (3) obviously intends, for the benefit of the taxpayers, that the multiple bidders who are awarded contracts will remain as competitors, which will only occur if they are furnishing the same or similar property.

The amendments to the purchase orders issued to ENA and Qwest were, in effect, changing the RFP after the bids were opened. The RFP solicited proposals from bidders who were able to perform the entire contract which, under the wording of the RFP, would be a "total end-to-end service support solution." The RFP defined a proposal as "[a] written response including pricing information to a request for proposals that describes the solution or means of providing the property requested and which proposal is considered an offer to perform a contract *in full response to the request for proposals*." (Emphasis added.) The RFP did not seek bids for one contract to provide the backbone and a separate contract to be the E-rate service provider.

An RFP is required to "describe the property to be acquired in sufficient detail to apprise a bidder of the exact nature or functionality of the property required." I.C. § 67-5718(2). A "request for proposals may be changed by the buyer through issuance of an addendum, provided the change is issued in writing prior to the bid opening date and is made available to all vendors receiving the original solicitation." IDAPA 38.05.01.052. By amending the contracts so that Qwest and ENA were no longer furnishing the same or similar property, the State has, in effect, changed the RFP after the bids had been opened in violation of I.C. § 67-5718(2) and IDAPA 38.05.01.052. The separate contracts as amended no longer conform to the RFP's description of the property to be acquired. The description of property to be provided by Qwest under its amended contract is not a minor deviation from the property to be provided by the successful bidder under the RFP, nor is the property to be provided by ENA under its amended contract. "[M]ere schemes to evade law, once their true character is established, are impotent for the

purpose intended. Courts sweep them aside as so much rubbish." *O'Bryant*, 78 Idaho at 325, 303 P.2d at 678.

Syringa has alleged a distinct and palpable injury, not suffered by all Idaho citizens, that is alleged to have been caused by the challenged conduct and that can be redressed by judicial relief. The record indicates that had the RFP solicited bids for separate contracts that described the property to be acquired in accordance with the amended contracts ultimately awarded, Syringa would have bid to perform the work specified in the amended contract awarded to Qwest. Syringa submitted a bid to ENA to perform that same work. Therefore, Syringa has standing to challenge the amended contract to Qwest because it constituted, in effect, changing the RFP after the bids were opened.

**b. Syringa had no administrative remedies to exhaust.** The district court held that Syringa failed to exhaust its administrative remedies under Idaho Code section 67-5733. That statute did not provide Syringa with any administrative remedy to challenge the amendment to ENA's contract. The statute permits a vendor to administratively challenge the specifications, I.C. § 67-5733 (1)(a), which are the "explicit requirements furnished with an invitation to bid, request for proposals or request for quotations upon which a purchase order or contract is to be based," IDAPA 38.05.01.011.45. The statute permits a bidder whose bid was found to be nonresponsive to appeal that decision administratively. I.C. § 67-5733(1)(b). It permits a bidder who was determined not to be the lowest responsible bidder to contest that determination. I.C. § 67-5733(1)(c). Finally, it permits an administrative challenge to an intended sole source procurement, I.C. § 67-5733(1)(d), which does not apply here because there was more than one vendor for the property to be acquired, I.C. § 67-5720(2). None of those administrative remedies permit the challenge being made by Syringa here. The district court erred in dismissing count three of Syringa's complaint on the ground that Syringa failed to exhaust its administrative remedies. The "failure to exhaust administrative remedies is not a bar to litigation when there are no remedies to exhaust." *Lochsa Falls, L.L.C. v. State*, 147 Idaho 232, 239-40, 207 P.3d 963, 970-71 (2009). Therefore, the district court erred in dismissing Syringa's challenge to the amended contract and/or purchase order(s) issued to Qwest.

## III.

### Did the District Court Err in Holding that the Teaming Agreement Was Unenforceable?

When reviewing on appeal the granting of a motion for summary judgment, we apply the same standard used by the trial court in ruling on the motion. *Infanger v. City of Salmon*, 137 Idaho 45, 46-47, 44 P.3d 1100, 1101-02 (2002). We construe all disputed facts, and draw all reasonable inferences from the record, in favor of the non-moving party. *Id*. at 47, 44 P.3d at 1102. Summary judgment is appropriate only if the evidence in the record and any admissions show that there is no genuine issue of any material fact regarding the issues raised in the pleadings and that the moving party is entitled to judgment as a matter of law. *Id*.

On January 7, 2009, Syringa and ENA entered into a teaming agreement. "A teaming agreement is not a phrase with a fixed meaning." *Cable & Computer Tech. Inc. v. Lockheed Sanders, Inc*., 214 F.3d 1030, 1034 (2000). "An American Bar Association handbook on government contracting speaks of teaming arrangements as 'primarily' including agreements 'under which the signatories cooperate to pursue a particular contract'; such agreements generally 'anticipate the entry into a separate subcontract or joint venture upon the award of a contract.' " *Id*. at 1034-35 (quoting Carl J. Peckinpaugh, *Government Contracts for Services* 89-90 (1997)). However, a teaming agreement can be drafted under which the parties agree to all of the necessary elements of a contract regarding the ultimate objective if one of them is a successful bidder. Teaming agreements are subject to the same requirements as other contracts that there must be an agreement as to all material terms of the contract.

The teaming agreement at issue in this case provided that ENA was to assume the lead role in preparing a proposal in response to the RFP, with Syringa providing such input, review, and information as required to complete the proposal. There is no contention that ENA breached that part of the teaming agreement. The issue is whether the parties had entered into a binding agreement regarding their relationship once ENA was awarded the contract. Syringa alleged that ENA had breached the teaming agreement after it was notified that it was a successful bidder. On ENA's motion for summary judgment, the district court held that the teaming agreement lacked material and sufficiently definite terms to be enforceable.

"It is essential to an enforceable contract that it be sufficiently definite and certain in its terms and requirements so that it can be determined what acts are to be performed and when performance is complete." *Dale's Service Co., Inc. v. Jones*, 96 Idaho 662, 664, 534 P.2d 1102, 1104 (1975). "No enforceable contract comes into being when parties leave a material term for future negotiations, creating a mere agreement to agree." *Maroun v. Wyreless Systems, Inc*., 141

Idaho 604, 614, 114 P.3d 974, 984 (2005) (quoting from 17A Am. Jur. 2d Contracts § 181 (2004)).

The teaming agreement stated that its purpose was "to define the parties' respective rights and obligations in connection with the Proposal, the Project, and the Prime Contract." It further stated that if ENA was awarded the prime contract, "ENA and Syringa shall enter into an agreement pursuant to which Syringa shall provide connectivity services statewide to ENA" and "the parties shall execute a partnership agreement as specified in this agreement that will also include any required flow-down provisions or other appropriate terms similar to those set forth in the Prime Contract." The teaming agreement then listed what the parties' respective responsibilities would be under such a partnership agreement. The agreement stated that ENA

> shall be responsible for the following functions for all participating schools and libraries: (i) procuring and owning all customer premises equipment, (ii) coordinating field service, (iii) managing the customer relationship, (iv) serving as the fiscal and contracting agent, including responsibility for invoicing and collections, (v) management of E-Rate funds, and (vi) procuring, managing, and provisioning last mile circuits.

The agreement stated that Syringa

> shall be responsible for (i) providing the statewide backbone for the services, (ii) providing and operating a network operations center for the backbone, (iii) providing for co-location of core network equipment, (iv) procuring and owning all customer premises equipment not provided by ENA, (v) coordinating field service for non-school or library sites, (vi) managing the customer relationship for non-school or library sites, and (vii) procuring, managing and provisioning last mile circuits for non-school or library sites.

The agreement also provided that ENA and Syringa would be jointly responsible for "(i) leveraging the best price from existing carrier relationships, (ii) developing additional carrier relationship for the purposes of this project and (iii) interfacing between last mile circuits and Syringa's backbone."

The district court held that the teaming agreement lacked the material term of price and that the logistics of how any work would be done was to be left to occur in subsequent negotiations. The court referred to the deposition of Syringa's CEO, who testified, "What this agreement does not state is how the money flow would happen." He stated: "We knew what things cost. We didn't know the way the money would flow." He testified that he expected the division of money to be worked out in subsequent negotiations. The court also pointed out that

10

the teaming agreement recognized that a further agreement would be required because it stated, "If ENA wins the Prime Contract as provided in Section 2(a) above, the parties shall execute a partnership agreement as specified in this agreement that will also include any required flow-down provisions or other appropriate terms similar to those set forth in the Prime Contract."

On appeal, Syringa argues that the district court erred in failing to consider that Syringa provided a fixed price bid to ENA and that it relied upon that bid in submitting its cost proposal to the State. "It is a settled common law contract principle that utilizing a subcontractor's bid in submitting the prime or general contract bid does not, without more, constitute an acceptance of the subcontractor's offer conditioned upon being awarded the general contract by the awarding authority." *Mitchell v. Siqueiros*, 99 Idaho 396, 399, 582 P.2d 1074, 1077 (1978). Syringa has not pointed to any agreement under which the parties agreed that the prices submitted by Syringa would be the prices that ENA would pay it. Because the parties did not agree upon price, which was a material term of the contract, the teaming agreement was not an enforceable contract. The district court did not err in dismissing the claim against ENA for breach of contract.


## IV.

**Did the District Court Err in Dismissing the Tortious Interference With Contract Claims?**

Syringa alleged that Qwest and Messrs. Gwartney and Zickau committed the tort of interference with a contract, which was the teaming agreement. Tortious interference with contract has four elements: "(1) the existence of a contract; (2) knowledge of the contract on the part of the defendant; (3) intentional interference causing a breach of the contract; and (4) injury to the plaintiff resulting from the breach." *Bybee v. Isaac*, 145 Idaho 251, 259, 178 P.3d 616, 624 (2008). The first requirement of the tort is the existence of a contract that would entitle a party to that contract to recover damages for its breach. *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266, 286, 824 P.2d 841, 861 (1991). Because the teaming agreement was not an enforceable contract, these parties could not have committed the tort of interfering with that alleged contract. Therefore, the district court did not err in dismissing the claim that Qwest and Messrs. Gwartney and Zickau committed the tort of interference with a contract.


## V.

**Did the District Court Err in Dismissing the Claim against Qwest of**

**Tortious Interference with a Prospective Economic Advantage?**

Syringa alleged that Qwest committed the tort of tortious interference with Syringa's prospective economic advantage by interfering with its ability to subcontract with ENA. In order to establish a claim for intentional interference with a prospective economic advantage, Syringa must show:

> (1) the existence of a valid economic expectancy, (2) knowledge of the expectancy on the part of the interferer, (3) intentional interference inducing termination of the expectancy, (4) the interference was wrongful by some measure beyond the fact of the interference itself, and (5) resulting damage to the plaintiff whose expectancy has been disrupted.

*Cantwell v. City of Boise*, 146 Idaho 127, 138, 191 P.3d 205, 216 (2008). The interference may be shown to be wrongful by proof that either: (1) the interferer had an improper motive to harm the plaintiff; or (2) the means used by the interferer to cause injury to the prospective advantage were wrongful by reason of a statute, regulation, recognized common law rule, or an established standard of a trade or profession. *Yoakum v. Hartford Fire Ins. Co.*, 129 Idaho 171, 178, 923 P.2d 416, 423 (1996). The mere pursuit of one's own business purposes is not sufficient to support an inference of an improper motive to harm the plaintiff. *Id.* at 179, 923 P.2d at 424; *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 582 P.2d 1365, 1372 (Or. 1978).

For purposes of its motion for summary judgment, Qwest assumed that Syringa could establish the existence of a valid economic expectancy, knowledge of the expectancy by Qwest, and damages. The only issues were whether there was a genuine issue of material fact as to whether Qwest intentionally interfered to induce the termination of the expectancy and did so by some measure beyond the fact of interference itself.

The economic expectancy was that Syringa would be able to enter into a subcontract with ENA to provide the backbone. Once the Department of Administration issued the amended contracts, ENA no longer had a contract to provide the backbone and, therefore, no need to enter into a subcontract with Syringa. The district court granted summary judgment as to this claim because the record showed that the decision on how to divide the work between Qwest and ENA was a unilateral decision by the Department of Administration.

The director of the Department submitted an affidavit stating: "After the initial award, Administration then unilaterally determined how best to divide the work between the two awardees/contractors. Administration's determination was based upon the individual strengths

12

of each awardees/contractors' proposals." Syringa contends that there is an issue of fact as to whether the Department made that decision without improper influence from Qwest.

ENA initially entered into a contract with the State to provide the property specified in the RFP. It was the later amendment of that contract that left ENA with no need of Syringa's services. Thus, to preclude summary judgment, Syringa must point to evidence creating a genuine issue of material fact showing that Qwest wrongfully induced ENA to agree to the amendment of its contract, either directly or indirectly through the State. Syringa contends that such interference is shown by the facts that between the issuance of the letter of intent to award contracts to Qwest and ENA and the issuance of the amended contracts: (a) Qwest engaged in closed-door meetings with the State and with ENA; (b) Qwest asked ENA to withdraw as a prime contractor and become a subcontractor of Qwest; and (c) Qwest submitted draft language to the State of a proposed amendment to its contract under which it would be the prime contractor for providing the backbone. These facts do not create a genuine issue of material fact as to whether it was the Department that unilaterally determined how to divide the work between Qwest and ENA.

The director of the Department testified that he first learned of the contents of the letter of intent during a telephone call with other employees of the Department. During that conversation, the employees stated that they wanted to "split the bid," which he understood to mean "that Qwest and ENA were asked to be partners and to go ahead and put this project in place." When asked whether Qwest and ENA being partners would mean they were both providing the same or similar property but at different locations, he responded: "No. What it means is they bring different skills to the game. And they can get together and utilize those skills efficiently." He testified that the intent of awarding contracts to Qwest and ENA was for ENA to be the E-rate provider and for Qwest to provide the connectivity and that they were not to provide the same or similar services.

The director met together with both Qwest and ENA after the multiple awards were made. The ENA representative at that meeting informed Syringa in an email sent on January 30, 2009, that the director "made it clear that he'd be running things and that he wanted ENA and Qwest to get together and come to an amicable solution to how we all might execute."

13

Although Qwest thereafter had closed-door meetings with the State and with ENA, Syringa cannot point to anything that Qwest did during those meetings that would have induced ENA to agree to the contractual amendment. Suspicion is not a substitute for facts.

Being the E-rate provider and providing the backbone were the major elements of the RFP. On February 6, 2009, Qwest learned that the State was going to designate ENA as the E-rate provider for the project. On February 10, 2009, a Qwest representative asked an ENA representative if ENA would agree to withdraw and become a subcontractor of Qwest. ENA obviously did not agree to do that. On February 10, 2009, Qwest also sent an email to the State with a proposed amendment to its contract under which Qwest would be "the contractor for all IEN network services" with ENA being listed as the E-rate service provider. The email also included a list of reasons why ENA should not be listed as the E-rate service provider and Qwest should be. On February 12, 2009, the State formally designated ENA as the E-rate service provider, obviously not acceding to Qwest's request to be the service provider.

ENA had an apparent business purpose for not objecting to the amendment of its contract with the State. If the original contracts remained in place, the work would have to be divided geographically. ENA would have a contract for an undefined portion of the State, but would have to subcontract with another to provide the backbone for that part of the State. With the amendment, ENA will not be responsible for subcontracting to provide the backbone, but will instead be the E-rate service provider for the entire state.

The facts argued by Syringa do not create a genuine issue of fact that it was not the Department's decision to divide the work between ENA and Qwest in the manner it was done by the amended contracts. The district court did not err in granting summary judgment dismissing this claim against Qwest.

## VI.

### Did the District Court Err in Awarding Attorney Fees to Qwest?

The district court awarded Qwest attorney fees pursuant to Idaho Code section 12-120(3) on the ground that this was an action by Syringa to recover against Qwest in a commercial transaction. The district court held that this action arose out of a commercial transaction because "the IEN procurement contemplated numerous commercial transactions between Syringa and Qwest, even though the direct prime contract would be between Qwest and the State and/or ENA

14

and the State." However, as the district court acknowledged: "[T]he action must arise from a commercial transaction between the parties. *BECO Constr. Co., Inc. v. J-U-B Eng'rs, Inc.*, 145 Idaho 719, 726, 184 P.3d 844, 851 (2008)."

Here, there was no commercial transaction between Qwest and Syringa, and Syringa's claims against Qwest did not allege that there were. That there may in the future have been commercial transactions between Qwest and Syringa is not relevant to the award of attorney fees in this action. Syringa's claims against Qwest in this action were not to recover in an alleged commercial transaction between them. The district court erred in awarding attorney fees to Qwest under Idaho Code section 12-120(3) on the ground that this was an action against Qwest to recover in a commercial transaction.

Qwest also sought attorney fees below under Idaho Code section 12-121. The district court did not address that basis of the requested award because it had awarded attorney fees under section 12-120(3). Qwest asks that if we hold that section 12-120(3) was not applicable, we should uphold the award under section 12-121. In order to be awarded attorney fees under that statute, Qwest must be the prevailing party. In addition, the district court must conclude, in its discretion, that the action was brought frivolously, unreasonably, or without foundation. *Garner v. Povey*, 151 Idaho 462, 467-68, 259 P.3d 608, 613-14 (2011). At this point, Qwest is not a prevailing party. Once there is a prevailing party in the litigation, then the district court can consider that party's request for an award of attorney fees.

## VII.

### Did the District Court Err in Failing to Award the State Attorney Fees
### Pursuant to Idaho Code Section 12-120(3) or 12-117(1)?

The State Defendants sought an award of attorney fees pursuant to Idaho Code sections 12-120(3), 12-121, 12-117, and 6-918A. The district court denied the request for an award of attorney fees under sections 12-117 and 6-918A based upon the merits, and the State Defendants have not appealed that denial. They only challenge our prior decisions regarding the applicability of section 12-120(3).

The district court denied an award of fees under section 12-120(3) based upon our holding in *State v. Hagerman Water Right Owners, Inc.*, 130 Idaho 718, 723, 947 P.2d 391, 396 (1997), wherein we stated, "I.C. § 12-117 provides the exclusive basis upon which to seek an

15

award of attorney fees against a state agency." That holding has been followed in subsequent cases, but it is incorrect. Section 12-117(1) sets forth specific conditions upon which attorney fees can be awarded "in any proceeding involving as adverse parties a state agency or a political subdivision and a person." However, the statute begins with the words "[u]nless otherwise provided by statute." Therefore, if another statute expressly provides for the awarding of attorney fees against a state agency or a political subdivision, attorney fees can be awarded under that statute also.

Idaho Code section 12-120(3) provides:

In any civil action to recover on an open account, account stated, note, bill, negotiable instrument, guaranty, or contract relating to the purchase or sale of goods, wares, merchandise, or services and in any commercial transaction unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney's fee to be set by the court, to be taxed and collected as costs.

The term "commercial transaction" is defined to mean all transactions except transactions for personal or household purposes. The term "party" is defined to mean any person, partnership, corporation, association, private organization, the state of Idaho or political subdivision thereof.

The statute provides that the prevailing *party* is entitled to an award of attorney fees in the specified types of civil actions, and it expressly defines *party* to include "the state of Idaho or political subdivision thereof." Although the only "party" mentioned in the statute is the prevailing party, it is unlikely that the legislature intended for the statute to apply to the State or a political subdivision only if that entity prevails and not if it loses. Therefore, we hold that section 12-117(1) is not the exclusive basis upon which to seek an award of attorney fees against a state agency or political subdivision, but attorney fees may be awarded under any other statute that expressly applies to a state agency or political subdivision, such as sections 12-120(3) and 12-121. On remand, the district court can reconsider whether the State Defendants are entitled to an award of attorney fees under an applicable statute other than section 12-117(1).

## VIII.

### Is any Party Entitled to an Award of Attorney Fees on Appeal?

Syringa seeks an award of attorney fees against ENA on appeal pursuant to Idaho Code section 12-120(3) on the ground that its action against ENA is to recover in a commercial transaction. Because Syringa failed to prevail on its breach of contract claim against ENA, it is

not entitled to an award of attorney fees under that statute. *Storey Constr. Inc. v. Hanks*, 148 Idaho 401, 411, 224 P.3d 468, 478 (2009).

ENA seeks an award of attorney fees against Syringa on appeal pursuant to Idaho Code section 12-120(3). Because this is an action by Syringa to recover against ENA in an alleged commercial transaction, ENA is entitled to an award of attorney fees on appeal against Syringa.

Qwest seeks an award of attorney fees on appeal against Syringa pursuant to Idaho Code sections 12-120(3). As we have held above, because there was no commercial transaction between Qwest and Syringa, nor was one alleged, Qwest is not entitled to attorney fees on appeal against Syringa.

The State seeks an award of attorney fees on appeal pursuant to sections 12-117(1), 12-120(3), and 12-121. All three statutes are expressly applicable to the State, but they all only provide for the award of attorney fees to the prevailing party. Because the State and Syringa have both prevailed in part on appeal, the State is not the prevailing party on appeal. *Tapadeera, LLC v. Knowlton*, 153 Idaho 182, ___, 280 P.3d 685, 692 (2012).

## IX.
### Conclusion.

We affirm the judgment dismissing all counts of the complaint except count three seeking to set aside the State's contract with Qwest on the ground that it was awarded in violation of the applicable statutes. We remand that claim for further proceedings that are consistent with this opinion. We reverse Qwest's award of attorney fees against Syringa. We remand to the trial court the determination of whether any of the State Defendants are entitled to an award of attorney fees against Syringa for proceedings in the district court. We award costs and attorney fees on appeal to ENA. Because the State Defendants and Syringa both prevailed only in part on appeal, we do not award them either costs or attorney fees on appeal.

Chief Justice BURDICK and Justice W. JONES, **CONCUR.**

J. Jones, J., specially concurring.

I concur in the Court's opinion but wish to address two somewhat related issues. First, I agree that the teaming agreement was not sufficient to bind ENA after it received the contract

17

award, but I think ENA's subsequent actions toward Syringa were less than honorable. Because there was no enforceable contract, I don't believe that a tortious interference with contract claim can be sustained against Mr. Gwartney, although in my estimation a tortious interference with prospective economic advantage claim could have survived summary judgment, if it had been alleged against him.

With regard to the teaming agreement, the Court correctly holds that the agreement was insufficient in setting out the details of the relationship between the parties following a contract award. The parties should have included provisions setting out their respective rights and obligations under the partnership agreement called for in the teaming agreement, or a mechanism by which those provisions could have been established, such as working out disputed provisions through use of binding arbitration. Neither approach was utilized by the parties and, therefore, the teaming agreement did not contain the essentials for an enforceable contract. It must be observed, however, that ENA was somewhat disloyal to its teaming partner, Syringa. When it appeared that the State was planning on having Qwest provide the connectivity services that ENA had intended on having Syringa provide under its bid, it didn't take long for ENA to forsake its team partner and cozy up to Qwest. ENA acknowledged in its briefing and argument that it did not have the ability, standing alone, "to provide a complete, statewide bid in response to the [State's request for proposal]"—it needed to team up with Syringa. After the contracts were awarded, and subsequently revised to essentially cut Syringa out, ENA does not appear to have worried too much about the fate of its former team partner and was not very straight-forward in letting Syringa know that it was being cut loose. ENA couldn't have been admitted to the dance without the help of its team partner but didn't have much problem switching dance partners once it got through the door.

Because the teaming agreement was insufficient for enforcement, Syringa's claim against Mr. Gwartney for tortious interference with contract is not sustainable. That claim was alleged specifically against Gwartney, the Department of Administration, Zickau and Qwest. The tortious interference with prospective economic advantage claim was alleged only against Qwest. That claim did not depend upon the existence of an enforceable contract. Had it been alleged against Gwartney, I would have found sufficient evidence and inferences in the record to allow the matter to go trial. Gwartney appears to have been the architect of the State's effort to bend the contracting rules to Qwest's advantage. In deposition testimony, he essentially admitted

knowing, even before the contract award was made on January 20, 2009, that Qwest would be "making the connections and providing the broadband" for IEN.[2] This was the work that Syringa was to perform under its teaming agreement with ENA. Syringa alleges that Gwartney made threatening statements against Syringa on a couple of occasions, indicating he would "make sure Syringa would never get any of the IEN business." In all, there was sufficient evidence to have sustained a cause of action for tortious interference with prospective advantage as against Gwartney, had one been pleaded against him. However, it was not.

Justice HORTON CONCURS.

---

[2] Although he subsequently claimed he misspoke.